Gregory W. Mitchell
THE MITCHELL LAW FIRM, L.P.
12720 Hillcrest Road, Suite 625
Dallas, Texas  75230
(972)463-8417 – Office
(972)432-7540 – Facsimile
State Bar ID:  00791285

ATTORNEYS FOR APPELLANT KYLE LAWRENCE

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| **Kyle Lawrence** | § | |
| | § | |
| *Appellant* | § | |
| | § | **Appeal No. 3:19-cv-01843-X** |
| **v.** | § | |
| | § | |
| **Frost Bank** | § | |
| | § | |
| *Appellee* | § | |

---

## BRIEF OF APPELLANT, KYLE LAWRENCE

---

**DATED this 5th day of January, 2020.**

Respectfully submitted,

THE MITCHELL LAW FIRM, L.P.

**/s/   Gregory W. Mitchell**
Gregory W. Mitchell
12720 Hillcrest Road
Suite 625
Dallas, Texas  75230
(972)463-8417 – Office
(972)432-7540 – Facsimile
State Bar ID:  00791285
E-mail:  greg@mitchellps.com
ATTORNEY FOR APPELLANT, KYLE
LAWRENCE

## IDENTITY OF PARTIES AND COUNSEL

**Defendant/Appellant:**                Kyle Lawrence

**Appellate and Trial Counsel**          The Mitchell Law Firm, L.P.
**For Appellant:**                       Gregory W. Mitchell
                                         12720 Hillcrest Road, Suite 625
                                         Dallas, Texas  75230[1]


**Plaintiff/Appellee:**                  Frost Bank

**Appellate and Trial Counsel**          Adams, Lynch & Loftin, P.C.
**For Appellee:**                        M. Chad Berry
                                         3950 Highway 360
                                         Grapevine, Texas  76051

---

[1] The address for Counsel for Appellant will change as of March 1, 2020, to the following address:  1412 Main Street, Suite 500, Dallas, Texas  75202.

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ 3

TABLE OF AUTHORITIES ......................................................................................... 5

SUMMARY .................................................................................................................. 8

STATEMENT OF ISSUES ........................................................................................... 9

STANDARD OF APPELLATE REVIEW .................................................................. 11

STATEMENT OF THE CASE ................................................................................... 11

    Nature of the Case ................................................................................................. 11

    Facts of the Case ................................................................................................... 11

ARGUMENT .............................................................................................................. 21

    Issue #1:  Whether the Bankruptcy Court erred in finding that Appellee has standing to bring this suit .......................................................................................................... 21

    Issue #2:  Whether the Bankruptcy Court erred in finding that Appellant made any knowing false representations to Appellee .............................................................. 27

    Issue #3:  Whether the Bankruptcy Court erred in finding that Appellee justifiably relied on any representations found to have been made by Appellant ......................... 37

    Issue #4:  Whether the Bankruptcy Court erred in dismissing Appellant's counterclaim regarding the discharge injunction violation represented by Appellee's state court lawsuit against LB Commercial Roofing, LLC – which sought to collect the same debt ................................................................................................................................ 40

    Issue #5:  Whether the Bankruptcy Court erred in dismissing Appellant's affirmative defense of offset and credit ...................................................................................... 42

    Issue #6:  Whether the Bankruptcy Court erred in finding that any payments to Appellant constituted the collateral of Appellee .......................................................... 44

    Issue #7:  Whether the Bankruptcy Court erred in finding that the accounts receivable was the "asset transferred" as opposed to the project contract ..................................... 48

    Issue #8:  Whether the Bankruptcy Court erred in finding that the agreement with Cross Timbers Church was with Lawrence Built, LLC, instead of with LB Commercial Roofing, LLC .......................................................................................................... 49

    Issue #9:  Whether the Bankruptcy Court erred in its finding and calculation of damages ................................................................................................................... 50

    Issue #10:  Whether the Bankruptcy Court erred in declaring the total amount of the contractual debt non-dischargeable where no alleged false representation was made prior to the execution of Note 1 and Note 2 (as defined in the Court's findings and conclusions) ............................................................................................................. 53

Issue #11:  Whether the Bankruptcy Court erred in finding any amount of the contractual debt non-dischargeable when no evidence of the outstanding balance of Note 3 was presented to the court ................................................................................. 54

Issue #12:  Whether the Bankruptcy Court erred in allowing evidence outside the scope of the Complaint, specifically including any allegedly fraudulent act except the transfer of three checks ........................................................................................................... 56

Issue #13:  Whether the Bankruptcy Court erred in considering purported fraudulent actions that occurred subsequent to the Debtor's petition for bankruptcy .................... 58

Issue #14:  Whether the Bankruptcy Court erred in finding the existence of "actual fraud" ............................................................................................................................... 60

Issue #15:  Whether the Bankruptcy Court's finding of a supposedly "fraudulent conveyance scheme" can stand without the existence of an actual "fraudulent conveyance" as defined under Texas or federal law ..................................................... 63

Issues #16-19:  Intentionally Omitted ............................................................................ 65

Issue #20:  Whether the Bankruptcy Court erred in disallowing testimony of Appellant regarding his knowledge or intent ................................................................................... 65

Issue #21:  Whether the Bankruptcy Court erred in disallowing the testimony of Danny Stokes and Kent Sparks, signers of checks ...................................................................... 66

Issue #22:  Whether the Bankruptcy Court erred in allowing into evidence Wells Fargo bank statements with no business records affidavit ...................................................... 67

Issue #23:  Whether the Bankruptcy Court erred in admitting Appellee's Exhibits 21-36 and 51 based on a clearly defective business records affidavit ............................... 68

Issue #24:  Intentionally Omitted ................................................................................... 69

Issue #25:  Whether the Bankruptcy Court inappropriately comments on the alleged credibility of witnesses as a pretext for supporting its ultimate conclusions – despite no statement of any basis for its comments ...................................................................... 70

Issue #26:  Whether the Bankruptcy Court erred by and prejudiced Appellant by limiting the amount of time allowed for Appellant to present its case in chief (which was substantially less time than was allowed for Appellee to present its case in chief) .................................................................................................................................... 74

CONCLUSION ................................................................................................................ 75

CERTIFICATE OF COMPLIANCE ............................................................................... 75

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-42 (Tex. 2019)............ 63

*Alvine v. Keller (In re Keller)*, 72 B.R. 599 (Bankr. M.D. Fla. 1987) .............................. 36

*Augustine v. Pare*, Adv. Proc. No. 09-00173 (Bankr. Md., 2010).................................... 36

*Baker v. Firstcom Music*, 2018 WL 2572725 (C.D. Cal., 2018) ...................................... 67

*BFP v. Resolution Trust Corporation*, 511 U.S. 531, 540-541 ........................................ 24

*Blackwell v. Dabney*, 702 F.2d 490 (4th Cir., 1983) ........................................................ 35

*Field v. Mans*, 516 U.S. 59 ................................................................................................ 37

*Guey Ming Yeh v. Safeco Insurance Company of Indiana*, Case No. 4:18-cv-00026 (U.S. District Court, E.D. Texas, 2018) ................................................................................. 57

*Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)... 57

*Husky Int'l Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016)...................................... passim

*In re 1701 Commerce Street*, 511 B.R. 812 ...................................................................... 64

*In re Barr*, 194 B.R. 1009 (Bankr. N.D. Ill, 1996) .......................................................... 36

*In re Colonial Realty Co.*, 980 F.2d 125, 131 (2nd Cir. 1992) ........................................ 41

*In re Cozart*, No. 5:08-bk-73392 (Bankr. W.D. Ark. May 5, 2009)................................. 36

*In re Escalante v. Escalante*, Cause No. 10-01147 (Bankr. N.M., 2011)........................ 36

*In re Lombard*, 2017 WL 4857416 (Bankr. N.H., October 25, 2017)....................... passim

*In re Schimmelpennick*, 183 F.3d 347 (5th Cir. 1999)..................................................... 23

*In U.S. v. Anderson*, 904 F.2d 41 (9th Cir. 1990) ............................................................ 67

*Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct.1752, 201 L.Ed.2d 102 (2018) ....... 37

*Malekan v. Etesamnia (In re Etesamnia)*, Cause No. 13-01695 (B.A.P. 9th Cir., 2015) . 36

*Matter of Educators Group Health Trust*, 25 F.3d 1281 (5th Cir. 1994) ........................ 23

*Matter of Mercer*, No. 98-60693 (5th Cir., 2000) ............................................................ 37

*Matter of S.I. Acquisition Inc.*, 817 F.2d 1142 (5th Cir. 1987) ......................................... 23

*Matter of Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008) ............................... 23

*Nobles v. Marcus*, 533 S.W.2d 923 (Tex. 1976) ............................................................... 21

*Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990) ............................................................ 57

*Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W. 3d 494, 503-04 (Tex. 2015) ............................................................................................................................. 46

*Sauer Inc. v. Lawson (In re Lawson)*, 791 F.3d 214 (1st Cir. 2015) ................... 25, 60, 61

*TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589, 603 (Tex. App. – Houston [14th Dist.] 2017, no pet.) ............................................................................... 23

*Torres-Aponte v. JP Morgan Chase Bank, N.A.*, No. 15-20362 (5th Cir. 2016) ............. 57

*Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598, 691 (Bankr. S.D. Tex., 2018) ............................................................................................................... 21, 22, 61

*Tummel v. Milane*, Case No. 19-40148 (5th Cir. December 6, 2019) ............................. 63

*United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005) ...................................................................................................................... 57

*Wallin v. Fuller*, 476 F.2d 1204, 1210 (5th Cir. 1973) .................................................... 57

## Statutes

11 U.S.C. § 362(a)(1) .................................................................................................. 40, 41

11 U.S.C. § 362(a)(3) ........................................................................................................ 41

11 U.S.C. § 523(a)(2)(A) ............................................................................................ passim

11 U.S.C. § 523(a)(2)(B)………………………………………………………....…39

11 U.S.C. § 524 ................................................................................................................. 41

11 U.S.C. § 721 ................................................................................................................. 17

28 U.S.C. § 158(a)(1) ......................................................................................................... 8

Rhode Island Uniform Fraudulent Transfer Act, R.I. Gen. Laws § 6–16–1 et seq. ......... 61

Tex. Bus. & Comm. C. § 24.002 ....................................................................... 64

Tex. Bus. Orgs. Code § 21.223 ................................................................... 22, 23

**Rules**

Fed. R. App. P. 32(a)(7)(B)(i) ........................................................................ 75

Fed. R. App. P. 32(g) ...................................................................................... 75

Fed. R. Bankr. P. 7009 ................................................................................... 56

Fed. R. Civ. P. 9(b) ................................................................................... 56, 57

**Treatises**

W. Prosser, Law of Torts § 108, at 717 (4th ed. 1971) ...................................... 37

**TO THE HONORABLE BRANTLEY STARR, UNITED STATES DISTRICT JUDGE:**

Kyle Lawrence ("**Lawrence**" or "**Appellant**") files this Appellant's Brief, and states:

## SUMMARY

1.      The Bankruptcy Court found in favor of Appellee on its nondischargeability cause of action under 11 U.S.C. 523(a)(2)(A) and awarded Appellee damages, including attorneys' fees.

2.      The Bankruptcy Court's ruling should be reversed in total or in part for a variety of reasons as described herein, the most compelling of which include:

> (1) The lack of any false representations on the part of Appellant;
>
> (2) The lack of any representations on which Appellee could reasonably rely;
>
> (3) The unwarranted dismissal of Appellant's counterclaim and the affirmative defense of offset and credit;
>
> (4) The lack of standing of Appellee to have brought this case;
>
> (5) The Bankruptcy Court's findings regarding the existence of Appellee's Collateral; and
>
> (6) The Bankruptcy Court's determination of damages.

## STATEMENT OF APPELLATE JURISDICTION

3.      This Court has jurisdiction of this appeal pursuant to 28 U.S.C. § 158(a)(1).

## STATEMENT OF ISSUES

4.      The issues presented in this Brief are as follows, presented here in the order in which they will be addressed in this Brief (NOTE:  for the sake of reference, the parenthetical number indicates the numbered issue from Appellant's "Statement of Issues to Be Presented on Appeal"):

➔ **Issue #1:**  Whether the Bankruptcy Court erred in finding that Appellee has standing to bring this suit (1);

➔ **Issue #2:**  Whether the Bankruptcy Court erred in finding that Appellant made any knowing false representations to Appellee (11);

➔ **Issue #3:**  Whether the Bankruptcy Court erred in finding that Appellee justifiably relied on any representations found to have been made by Appellant (12);

➔ **Issue #4:**  Whether the Bankruptcy Court erred in dismissing Appellant's counterclaim regarding the discharge injunction violation represented by Appellee's state court lawsuit against LB Commercial Roofing, LLC – which sought to collect the same debt (2);

➔ **Issue #5:**  Whether the Bankruptcy Court erred in dismissing Appellant's affirmative defense of offset and credit (3);

➔ **Issue #6:**  Whether the Bankruptcy Court erred in finding that any payments to Appellant constituted the collateral of Appellee (18);

➔ **Issue #7:**  Whether the Bankruptcy Court erred in finding that the accounts receivable was the "asset transferred" as opposed to the project contract (22);

➔ **Issue #8:**  Whether the Bankruptcy Court erred in finding that the agreement with Cross Timbers Church was with Lawrence Built, LLC, instead of with LB Commercial Roofing, LLC (10);

➔ **Issue #9:**  Whether the Bankruptcy Court erred in its finding and calculation of damages (19);

➔ **Issue #10:**  Whether the Bankruptcy Court erred in declaring the total amount of the contractual debt non-dischargeable where no alleged

false representation was made prior to the execution of Note 1[2] and Note 2[3] (20);

➜ **Issue #11**:  Whether the Bankruptcy Court erred in finding any amount of the contractual debt non-dischargeable when no evidence of the outstanding balance of Note 3[4] was presented to the court;

➜ **Issue #12**:  Whether the Bankruptcy Court erred in allowing evidence outside the scope of the Complaint, specifically including any allegedly fraudulent act except the transfer of three checks (4);

➜ **Issue #13**:  Whether the Bankruptcy Court erred in considering purported fraudulent actions that occurred subsequent to the Debtor's petition for bankruptcy (5);

➜ **Issue #14**:  Whether the Bankruptcy Court erred in finding the existence of "actual fraud" (13);

➜ **Issue #15**:  Whether the Bankruptcy Court's finding of a supposedly "fraudulent conveyance scheme" can stand without the existence of an actual "fraudulent conveyance" as defined under Texas or federal law (14);

➜ **Issues #16-19**:  Intentionally omitted

➜ **Issue #20**:  Whether the Bankruptcy Court erred in disallowing testimony of Appellant regarding his knowledge or intent (9);

➜ **Issue #21**:  Whether the Bankruptcy Court erred in disallowing the testimony of Danny Stokes and Kent Sparks, signers of checks (6);

➜ **Issue #22**:  Whether the Bankruptcy Court erred in allowing into evidence Wells Fargo bank statements with no business records affidavit (7);

➜ **Issue #23**:  Whether the Bankruptcy Court erred in admitting Appellee's Exhibits 21-36 and 51 based on a clearly defective business records affidavit (8);

➜ **Issue #24**:  Intentionally omitted

➜ **Issue #25**:  Whether the Bankruptcy Court inappropriately comments on the alleged credibility of witnesses as a pretext for supporting its

---

[2] *See* ¶6 of the Court's Findings and Conclusions (Dkt. 93).
[3] *Id.*, at ¶8.
[4] *Id.*, at ¶10.

ultimate conclusions – despite no statement of any basis for its comments (25); and

➔ **Issue #26:**  Whether the Bankruptcy Court erred by and prejudiced Appellant by limiting the amount of time allowed for Appellant to present its case in chief (which was substantially less time than was allowed for Appellee to present its case in chief) (26).

## STANDARD OF APPELLATE REVIEW

5.      This Court reviews the Bankruptcy Court's findings of fact under the clearly erroneous standard,[5] and conclusions of law are subject to *de novo* review.[6]

## STATEMENT OF THE CASE

### Nature of the Case

6.      This is an appeal from an adversary proceeding related to an underlying bankruptcy liquidation case filed under Chapter 7 of Title 11 of the U.S. Code (the "**Bankruptcy Code**").  It concerns the judgment entered by the U.S. Bankruptcy Court for the Northern District of Texas, Hon. Stacey G.C. Jernigan, which granted judgment in favor of Appellee Frost Bank ("**Frost**" or "**Appellee**").[7]

### Facts of the Case

7.      Prior to December, 2015, Appellant engaged in business with his brother, Robert Lawrence, under the name Lawrence Brothers Construction, LLC ("**LBC**").[8]

8.      Effective December 15, 2015, Appellant and Robert Lawrence ceased doing business together and, as part of the split, executed the *Lawrence Brothers*

---

[5] *Richmond Leasing Co. v. Capital Bank, N.A.,* 762 F.2d 1303, 1308 (5th Cir. 1985).

[6] *In re Schaffer,* 515 F.3d 424, 426 (5th Cir. 2008); *Richmond Leasing Co.,* 762 F.2d at 1307.

[7] Findings and Conclusions, R. 44; Final Judgment, R. 41.

[8] R. 753 (380:10-22).

*Construction LLC Division, Distribution, and Redemption Agreement* (the "**Division Agreement**").[9]

9.      Pursuant to the Division Agreement, Appellant became the 100% owner and sole member of LBC.[10]

10.     Because of the financial challenges posed by the split, LBC sought loans to assist with the financing of its business.[11]

11.     On or about January 28, 2016, LBC took out a loan from Appellee in the form of a revolving line of credit in the amount of $125,000.00 (the "**Original Loan**").[12]

12.     The Original Loan was secured by "All Inventory and Accounts" of LBC, embodied in a "Commercial Security Agreement" executed contemporaneously with the Original Loan (the "**Original Security Agreement**").[13]

13.     Appellant personally guaranteed the Original Loan, embodied in a "Commercial Guarantee" executed contemporaneously with the Original Loan (the "**Original Personal Guarantee**").[14]

14.     On or about February 4, 2016, LBC took out a loan from  Appellee in the amount of $46,000.00 ("**Vehicle Loan #1**").[15]  Vehicle Loan #1 was secured by both a 2016 Chevy Silverado and a 2012 Chevrolet Silverado, reflected by two Commercial Security Agreements executed contemporaneously with the execution of Vehicle Loan #1.[16]

---

[9] *See* Exh. U; R. 754-5 (381:20-382:23).
[10] *Id.*
[11] R. 758-9 (385:12-386:19).
[12] R. 760-1 (387:24-388:9); *see* Exh. I at R. 1190.
[13] *See* Exh. I at R.1193.
[14] *Id.*, at R. 1206.
[15] Exh. FB-1 at 2nd Supp. R. 1.
[16] Exhs. FB-2 and FB-3 at 2nd Supp. R. 4-9 and 10-15, respectively.

15.     On or about March 17, 2016, LBC, filed a Certificate of Amendment with the Texas Secretary of State, thereby changing its name to Lawrence Built, LLC (hereinafter, "**LB**").[17]  Appellant was the sole owner and member of LB, and LB remained the obligor on the Original Loan and Vehicle Loan #1.[18]

16.     On or about June 10, 2016, LB took out a new loan from Appellee in the amount of $21,809.46 ("**Vehicle Loan #2**").[19]  Vehicle Loan #2 was secured by a 2012 Chevrolet Pickup, reflected by a Commercial Security Agreement executed contemporaneously with the execution of Vehicle Loan #2.[20]

17.     Appellee's debt was fully secured by the property of LB.[21]

18.     Business slowed during 2016, and as a result, Appellant and LB incurred additional debt in an effort to maintain their obligations.[22]

19.     Specifically, LB owed over $260,000.00 to various entities,[23] and Appellant owed $44,000.00 the IRS[24] and over $50,000.00 on personal credit cards.[25]

20.     The Original Loan matured on January 28, 2017.[26]  Therefore, on or about March 15, 2017, LB executed a renewal loan in the amount of $123,400.00 (the "**LB Renewal**") that replaced the Original Loan.[27]  In February, 2017, shortly before the execution of the LB Renewal, LB presented Appellee with an A/R Aging report (the

---

[17] Exh. FB-11 at 2nd Supp. R. 57-60; *see also* R. 508-9 (136:20-137:6).
[18] R. 510 (138:11-14).
[19] Exh. FB-4 at 2nd Supp. R. 16-18.
[20] Exh. FB-5 at 2nd Supp. R. 19-24.
[21] Exh. FB-2, FB-3, and FB-5 at 2nd Supp. R. 4-9, 10-15, and 19-24, respectively.
[22] R. 779 (406:21-407:12).
[23] *See* Exh. FB-19 at 2nd Supp. R. 145.
[24] *See* Exh. FB-18 at 2nd Supp. R. 117.
[25] *Id.*, at 2nd Supp. R. 118-121.
[26] Exh. I at R. 1190.
[27] Exh. J at R. 1210.

"**A/R Aging Report**"),[28] projections of future business (the "**Projections**"),[29] and financial statements showing that the income of LB had decreased substantially from 2015 in excess of $3,500,000.00 to 2016, where income was approximately $371,000.00 (the "**LB Financial Statements**").[30]

21.     The A/R Aging Report and the LB Financial Statements were true and correct at the time they were presented to Appellee.  The Projections were accurate, good faith projections of future income at the time presented.[31]

22.     Subsequent to the execution of the LB Renewal, LB lost business and revenue.  Specifically, but not by way of limitation, one company—CLA—with which – with which LB had signed projects totaling approximately $440,000.00, filed for bankruptcy.[32]  Additionally, LB was unable to collect approximately $45,000.00 from ARC Roofing.[33]  LB filed suit against ARC Roofing.[34]  That suit was pending at the time of the filing of Appellant's and LB's bankruptcy cases.

23.     The LB Renewal continued to be secured by the inventory and accounts of LB.  Additionally, Appellant remained personally liable on the LB Renewal.[35]

24.     No new money was received by LB from the LB Renewal.[36]  It simply renewed the Original Loan and extended the maturity date to March 15, 2018.[37]

---

[28] Exh. K at R. 1224 and discussion at R. 415 (43:22); R. 416 (44:13-24); R. 538 (166:22-24); R. 722 (349:20-351:3); R. 762 (389:17-390:6).
[29] Exh. L at R. 1226 and discussion at R. 415 (44:22-23); R. 418 (46:23-47:6); R. 541 (169:3-14); R. 765 (392:9-19).
[30] R. 467-8 (p. 95:25-96:16).
[31] R. 763 (390:3-6); R. 765 (392:17-19).
[32] R. 768 (395:22-24).
[33] R. 763 (390:10-21).
[34] *Id.*
[35] *See* Exh. J at R. 1215.
[36] R. 466 (94:6-11).
[37] Exh. J at R. 1212 and discussion at R. 466 (94:12-19).

25.    On or about March 8, 2017, LB entered into a contract with Cross Timbers Church ("CTC") to perform roofing work (the "**LB/CTC Contract**").  The LB/CTC Contract contained a project total price of $73,000.00.[38]  On or about March 20, 2017, LB received a deposit in the amount of $36,500.00 pursuant to the LB /CTC (the "**Deposit**"), which LB deposited into its Chase bank account that day.[39]

26.    LB deposited the Deposit into its Chase bank account on March 20, 2017.[40]

27.    Because of a large storm that hit CTC shortly after the receipt of the Deposit, the LB/CTC was suspended and ultimately canceled.[41]

28.    LB returned the Deposit to CTC in full on or about July 11, 2017.[42]

29.    Because of continued financial difficulties, Appellant initially consulted a bankruptcy attorney in early April, 2017, to discuss options for both LB and for him personally.[43]

30.    Although Appellant determined fairly immediately after such meeting that filing bankruptcy for both him and LB was in the best interests of both, he had to wait because he did not have sufficient funds to start the bankruptcy process at that time.[44]

31.    Although Defendant did not know what type of work he was going to pursue following bankruptcy, he knew that he needed a fresh start, and therefore on or about April 15, 2017, he submitted documentation to the Texas Secretary of State to set up a new

---

[38] R. 637 (264:5-8); *see also* Exh. FB-39 at 2nd Supp. R. 358-59.

[39] R. 644-5 (271:22-272:12).

[40] *See* Exh. X at R. 1352 and discussion at R. 796 (423:15-16).

[41] R. 796 (423:17-21).

[42] *See* Exh. X at R. 1360 and discussion at R. 797-8 (424:25-425:10).

[43] R. 783-4 (410:22-411:7).  The present discussion of attorney-client privileged communications is not intended to and does not waive the privilege as to any other communication.

[44] R. 784 (411:2-14).

company:  LB Commercial Roofing, LLC ("**LBCR**").  LBCR received its Certificate of Formation on April 18, 2017.[45]

32.     On or about June 26, 2017, Appellee provided a statement showing the payoff balance for a 2012 Chevy Silverado, a vehicle that was Appellee's collateral.  Such payoff balance was $15,000.00.[46]

33.     On or about July 1, 2017, LB sold the 2012 Chevrolet Silverado that secured Vehicle Loan #1 to an unrelated individual – Mr. Julio Escamilla – for $15,000.00.  LB paid the money received from the sale of the 2012 Chevrolet Silverado to Appellee.[47]  Appellant returned the two other vehicles that secured the Frost loans to Frost.[48]

34.     On or about July 11, 2017, LBCR entered into a contract with CTC for a new project (the "**LBCR/CTC Contract**").  The LBCR/CTC Contract had a different and much broader scope than the LB/CTC Contract.[49]

35.     The original LBCR/CTC Contract price was $464,013.80.[50]  Subsequently, the scope of work expanded, such that the ultimate contract price was projected to be $727,831.04.[51]

36.     In performing its services with respect to the LBCR/CTC Contract, LBCR incurred expenses in the ordinary course of its business – including but not limited to the purchase of supplies and the payment of subcontractors.[52]

---

[45] Exh. FB-13 at 2nd Supp. R. 66-69.

[46] R. 740-745 (367:15-372:3).

[47] *Id.*, at 744-5 (371:24-372:3).

[48] R. 460 (88:19-25); R. 785 (412:21-22).

[49] Exh. B at R. 1000.

[50] *Id.*, at R. 1001.

[51] Exh. FB-39 at 2nd Supp. R. 308, 313, 324.

[52] Exh. F at R. 1026; *see also* R. 783 (410:2-13).

37.     On or about July 10, 2017, CTC issued an initial deposit pursuant to the LBCR/CTC Contract in the amount of $232,006.90 ("**CT Check #1**").  CT Check #1 was inadvertently made payable to LB.[53]

38.     LBCR deposited CT Check #1 into its bank account at Wells Fargo Bank.[54]

39.     Both Appellant and LB filed for chapter 7 bankruptcy on July 30, 2017 (the "**Petition Date**").  As a result of its bankruptcy filing, LB could no longer service any contracts.[55]

40.     On or about November 1, 2017, CTC issued a progress payment pursuant to the LBCR/CTC Contract in the amount of $116,003.45 ("**CT Check #2**").  CT Check #2 was inadvertently made payable to LB.[56]

41.     LBCR deposited CT Check #2 into its bank account at Wells Fargo Bank.[57]

42.     On or about December 8, 2017, CTC issued a progress payment pursuant to the LBCR/CTC Contract in the amount of $197,862.93 ("**CT Check #3**").  CT Check #3 was inadvertently made payable to LB.[58]

43.     LBCR deposited CT Check #3 into its bank account at Wells Fargo Bank.[59]

---

[53] Exh. FB-40 at 2nd Supp. R. 438 and discussion at R. 684 (311:22-312:15), R. 697 (324:19-20); *see also* R. 704-5 (331:25-332:3) (all 4 payments were made pursuant to the same contract) and R. 705-9 (332:4-336:24) (Tivis sent e-mail to LB trustee to clarify that 3 of 4 checks were inadvertently made payable to the wrong entity).

[54] R. 649 (276:5-20); *see also* Exh. FB-44 at 2nd Supp. R. 443.

[55] *See* 11 U.S.C. §721 (only a Trustee can be authorized to operate the business of a chapter 7 debtor).

[56] Exh. FB-41, 2nd Supp. R. 439 and discussion at R. 698-9 (325:4-326:13); *see also* R. 704-5 (331:25-332:3) (all 4 payments were made pursuant to the same contract) and R. 705-9 (332:4-336:24) (Tivis sent e-mail to LB trustee to clarify that 3 of 4 checks were inadvertently made payable to the wrong entity).

[57] R. 650 (277:18-20); *see also* Exh.  FB-44 at 2nd Supp. R. 468.

[58] Exh. FB-42, 2nd Supp. R. 440 and discussion at R. 699-702 (326:18-329:4); *see also* R. 704-5 (331:25-332:3) (all 4 payments were made pursuant to the same contract) and R. 705-9 (332:4-336:24) (Tivis sent e-mail to LB trustee to clarify that 3 of 4 checks were inadvertently made payable to the wrong entity).

[59] R. 652 (279:1-6); *see also* Exh. FB-44 at 2nd Supp. R. 475.

44.     On or about December 20, 2017, CTC issued a final payment pursuant to the LBCR/CTC Contract in the amount of $163,327.76 ("**CT Check #4**").  CT Check #4 was correctly made payable to LBCR.[60]

45.     LBCR deposited CT Check #4 into its bank account at Wells Fargo Bank.[61]

46.     Payments totaling $709,201.04 were paid by CTC and received by LBCR pursuant to the LBCR/CTC Contract.[62]

47.     CTC issued LBCR a 1099 in the amount of $709,201.04 for 2017.

48.     LBCR claimed all of the payments received from the LBCR/CTC Contract on its 2017 federal income tax return.[63]

49.     On or about October 20, 2016, LB entered into a contract with Cresta Construction Company ("**Cresta**") for a project involving the installation of a new room at a Gold's Gym in College Station, Texas (the "**LB/Cresta Contract**").  The proposed project price was $204,700.00.[64]

50.     On or about January 4, 2018, Cresta issued a check to LB pursuant to the LB /Cresta Contract for retainage in the amount of $21,960.93 (the "**Cresta Retainage Check**").[65]  With the approval of the LB chapter 7 trustee, Appellant endorsed the Cresta

---

[60] Exh. FB-43, 2nd Supp. R. 441 and discussion at R. 702-4 (329:10-331:21); *see also* R. 704-5 (331:25-332:3) (all 4 payments were made pursuant to the same contract) and R. 705-9 (332:4-336:24) (Tivis sent e-mail to LB trustee to clarify that 3 of 4 checks were inadvertently made payable to the wrong entity).

[61] Exh. FB-44 at 2nd Supp. R. 477.

[62] *See, supra*, FB-40-FB-43.

[63] *See* Exh. N at R. 1242 and R. 727 (354:1-355:11) (testimony confirming that all income listed on Exh. N was included in the LBCR 2017 tax return).

[64] Exh. FB-21, 2nd Supp. R. 166.

[65] Exh. FB-51, 2nd Supp. R. 536.

Retainage Check over to Frost.[66]  LBCR performed a significant amount of warranty work for Cresta before Cresta would release the Cresta Retainage Check.[67]

51.     On or about August 21, 2017, after the filing of the LB bankruptcy, Cresta requested follow-up work with respect to the Gold's Gym project – specifically a "skin-over" representing roof repairs.  Since LB had filed a chapter 7 bankruptcy, thereby shutting down operations, it was incapable of performing the work.  Therefore, LBCR agreed to do the "skin-over" work—work that was beyond the scope of the LB/Cresta Contract.[68]

52.     In performing the skin-over work for Cresta, LBCR incurred expenses in the ordinary course of its business—including the purchase of supplies and the payment of subcontractors.[69]

53.     LBCR claimed all of the payments received from the "skin-over" work for Cresta on its 2017 federal income tax return.[70]

54.     By virtue of LBCR performing the skin-over work, Cresta was able to obtain a warranty for all of the roofing work that had previously been voided by work performed by third parties.[71]

55.     If LBCR had not performed the skin-over project, Cresta would not have paid the Cresta Retainage Check and thus Appellee would not have received the funds from that check.[72]

---

[66] *Id.* at 537.
[67] R. 829 (456:14-25).
[68] R. 827-8 (454:23-456:5).
[69] R. 829 (456:9-10).
[70] *See* Exh. N at R. 1242 and R. 727 (354:1-355:11) (testimony confirming that all income listed on Exh. N was included in the LBCR 2017 tax return).
[71] R. 828 (455:7-19).
[72] *Id.*

56.     On or about June 20, 2018, Frost brought a separate suit against LBCR in a Texas state court in a case styled *Frost Bank v. LB Commercial Roofing, LLC*, Case No. DC-18-08027.[73]

57.     On July 5, 2018, Appellant received his chapter 7 discharge.[74]

---

[73] Exh. P at R. 1246.
[74] Exh. S at R. 1323.

## ARGUMENT

### Issue #1:  Whether the Bankruptcy Court erred in finding that Appellee has standing to bring this suit.

58.     Texas law is clear that a party who was not defrauded by a conveyance has not suffered an invasion of a legal right and therefore does not have standing to bring suit based on that fraud.[75]  Appellee has asserted the existence of a "fraudulent conveyance scheme," but any such conveyance as described in Appellee's Complaint was committed by LB, not by Appellant.

59.     Although Appellant asserts that no fraud or conversion occurred, even if it did, any such cause of action would be owned by LB.  Appellee is not the allegedly defrauded party, but rather is a creditor of the alleged defrauded party.  Any cause of action which may have been created by the conduct of Appellant can only be asserted by the allegedly defrauded party and does not accrue to Appellee.[76]

60.     Moreover, Appellee never sought to pierce the corporate veil of LB.  Therefore, even though Appellant was a guarantor on the underlying debt to Appellee, Appellant's liability was only under a non-fraudulent theory of a breach of a personal guaranty.[77]

61.     Frost seeks to impose liability for a "fraudulent transfer scheme" on Appellant.  However, it does not establish any right to recovery directly from Appellant under state or federal law (other than a non-fraudulent breach of contract theory as noted

---

[75] *Nobles v. Marcus*, 533 S.W.2d 923 (Tex. 1976).

[76] *Id.*, at 927.

[77] *See Trustmark Nat'l Bank v. Tegeler (In re Tegeler)*, 586 B.R. 598, 691 (Bankr. S.D. Tex., 2018) ("Actual fraud" theory of liability under *Husky* required plaintiff pierce the corporate veil in order to hold owners of company liable – despite the existence of personal guarantees.).  *See* more detailed discussion of *In re Tegeler*, at ¶196 and corresponding n. 216-217, *infra*.

above).  Therefore, Appellee was required to establish some ground to pierce the corporate veil of LB, but Appellee did not make any such veil-piercing allegations.[78]

62.     Appellee asserts that the checks attached to its Complaint belonged to LB and were fraudulently transferred to LBCR.  However, even assuming Frost is correct that the funds were LB's, LB is the only person/entity that could transfer **its own** assets. Section 21.223 of the Tex. Bus. Orgs. Code limits Appellant's personal liability—even for allegedly fraudulent acts of the entity—unless he caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for his direct personal benefit.

63.     In this case, however, Appellee did not plead a veil-piercing theory under Tex. Bus. Orgs. Code §21.223, as was done in *Int'l Electronics, Inc. v. Ritz*, 136 S.Ct. 1581 (2016) ("**Husky**").[79]  Nor did Appellee plead that a fraud was perpetrated for Appellant's direct personal benefit.  Therefore, it cannot recover on such a theory.  And without the ability to pierce the corporate veil, Appellee cannot hold Appellant personally liable for anything other than the non-fraud based unsecured debt that he agreed to personally guarantee – which is clearly a dischargeable debt.[80]

64.     The Bankruptcy Court erred in allowing Appellee to pursue such a claim.

65.     In any event, Appellee could not have succeeded in a veil-piercing claim, as such a claim belongs to the estate.[81]  And if a cause of action belongs to the

---

[78] The Bankruptcy Court apparently believed that the existence of Appellant's personal guarantee somehow belied the necessity to pierce the corporate veil, but caselaw does not support such a notion.  *See Tegeler*, 586 B.R. at 691.

[79] *See Husky*, 136 S.C. at 1581.

[80] *See also, supra*, n.76 for support for the notion that veil-piercing is required notwithstanding the existence of personal guarantees and more detailed discussion of *In re Tegeler*, at ¶196 and corresponding n.216-217, *infra*.

[81] To the extent that Appellee contends that it could pierce the corporate veil (despite not having pled it), in a 2010 opinion issued by Judge Lynn in this district, Judge Lynn analyzed in detail the issue of whether a veil piercing claim could be asserted by an individual creditor, or whether it belonged to the estate.  Judge Lynn ultimately concluded in that case – *In re Ryan*, 443 B.R. 395 – that the Plaintiff therein was not entitled to pierce the corporate veil, as such a claim belonged the bankruptcy estate.  In so holding, he pointed to numerous Fifth Circuit opinions that had consistently held that most alter ego and similar claims are property of the estate.  *See e.g.,*

bankruptcy estate, then the trustee has exclusive standing to assert the claim.[82]  In this case, Appellee did not assert a veil-piercing theory, nor did it allege in its written pleadings that Appellant acted primarily for his direct personal benefit, as is required.[83] Further, since any transfer of assets as alleged in Appellee's complaint was perpetrated by LB, then any veil piercing cause of action would belong to the LB bankruptcy estate.

66.     Appellant therefore cannot be liable under a veil-piercing theory.

67.     Appellee recognized its deficiency, because at trial, it repeatedly focused on the "direct personal benefit" that must be shown under Tex. Bus. Orgs. 21.223(b).[84] Such "direct personal benefit" is only relevant to an attempt to pierce the corporate veil, as is authorized by that section.[85]  But caselaw, specifically including *Husky*, clearly requires that such veil-piercing be pled.  It was in *Husky*.  It was not here.

68.     The 2016 U.S. Supreme Court's opinion in *Husky* held that the term "actual fraud," as used in the discharge exception for debts under §523(a)(2)(A), encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation.  Undoubtedly recognizing the inability to identify or prove any misrepresentations made by Appellant in this case, Appellee repeatedly asserted *Husky's* "fraudulent conveyance schemes" language in its pre-trial documents.

69.     However, the case at bar bears no resemblance to the facts of *Husky*.

70.     The Supreme Court relied on the following findings:

All parties agree that between 2006 and 2007, Ritz drained

---

*Matter of Seven Seas Petroleum, Inc.*, 522 F.3d 575 (5th Cir. 2008); *In re Schimmelpennick*, 183 F.3d 347 (5th Cir. 1999); *Matter of Educators Group Health Trust*, 25 F.3d 1281 (5th Cir. 1994); *Matter of S.I. Acquisition Inc.*, 817 F.2d 1142 (5th Cir. 1987).

[82] *See Educators Group Health*, 25 F.3d at 1284.

[83] *See TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589, 603 (Tex. App. – Houston [14th Dist.] 2017, no pet.).

[84] *See, e.g.*, R. 920 (546:11-14); R. 931 (557:11-12); R. 973 (599:17-18).

[85] Appellee even acknowledged the requirement that it show such benefit.  *See* R. 931 (557:11-13) (Appellee's closing statement:  "So what – what do we have to show?  Actual fraud the debtor, perpetrated for the debtor's personal benefit.  We can meet these through circumstantial evidence.")

> [his company] of assets it could have used to pay its debts
> to creditors like Husky by transferring large sums of
> [company] funds to other entities Ritz controlled.
>
> . . .
>
> For instance . . . Ritz transferred $52,600 to CapNet Risk
> Management, Inc., a company he owned in full; $121,831
> to CapNet Securities Corp., a company in which he owned
> an 85% interest; and $99,386.90 to Dynalyst
> Manufacturing Corp., a company in which he owned a 25%
> interest.

71.     The Court in *Husky* went on to elaborate on the types of transfers that might be the subject of a "fraudulent conveyance scheme":

> Fraudulent conveyances typically involve 'a transfer to a
> close relative, a secret transfer, a transfer of title without
> transfer of possession, or grossly inadequate consideration.'
> (citing *BFP v. Resolution Trust Corporation*, 511 U.S. 531,
> 540-541).

72.     Once again, there are no facts in the case at bar that are similar to the gratuitous transfers found in *Husky*.

73.     In *In re Lombard*, 2017 WL 4857416 (Bankr. N.H., October 25, 2017)—a post- *Husky* decision—a creditor similarly sought to have a debtor's debt held to be non-dischargeable based on an alleged fraudulent conveyance scheme such as that alleged in *Husky*.  However, the Court in *Lombard* ultimately dismissed the case for failure to state a claim based on the failure of the plaintiff's pleading to claim any independent legal right to recover such a fraudulent transfer from the Debtor.[86]

---

[86] The court in *Lombard* stated the issue this way:

> This dispute presents a narrow legal issue for the Court's consideration, namely can the Court determine the
> dischargeability of a debt arising from an actually fraudulent transfer where a creditor has not asserted a claim upon which
> to recover such a debt from a debtor.  Here, the Plaintiffs have made specific factual allegations about the Debtor's conduct
> with regard to the transfers they allege are actually fraudulent, but they have not made any claim under state or federal law
> to be able to recover money or property from the Debtor on account of that conduct.  Instead, the Plaintiffs rely entirely on
> § 523(a)(2)(A) and argue that the Supreme Court in *Husky International Electronics, Inc. v. Ritz* and the First Circuit in

74.     In *Lombard*, the plaintiffs "made specific factual allegations about the Debtor's conduct with regard to the transfers they allege[d] [were] actually fraudulent, but they ha[d] not made any claim under state or federal law to be able to recover money or property from the Debtor on account of that conduct."[87]  The plaintiffs there "rel[ied] entirely on § 523(a)(2)(A)," as well as *Husky* and a First Circuit case, *Sauer Inc. v. Lawson*, 791 F.3d 214 (1st Cir. 2015).  *Lombard* held that "[n]either *Husky* nor *Lawson*— either explicitly or by implication—turn § 523(a)(2)(A) into a cause of action by which a creditor may recover a fraudulent transfer from a debtor."[88]  The *Lombard* Court reasoned that the claim in *Husky* was only valid because of the Texas statute allowing for shareholder liability for "actual fraud" of the corporation in certain circumstances.  Similarly, in *Lawson*, the creditor had obtained a judgment for the recovery of a fraudulent transfer prepetition under a Rhode Island statute.

75.     The Lombard court ultimately concluded:  "The Supreme Court's decision in *Husky* does not provide the means for a creditor to impose liability for a fraudulent transfer scheme on a debtor; what it does is allow a creditor with a claim for recovery of such a fraudulent transfer, under a specific state or federal law, to make out a case that the fraudulent transfer amounts to actual fraud within the meaning of § 523(a)(2)(A)."[89]

76.     The facts of the case at bar are virtually identical to those in *Lombard*.  Frost seeks to impose liability for a fraudulent transfer scheme on Appellant.  However, it does not establish any right to recovery of the alleged fraudulent transfer directly from Appellant under state or federal law.  Notably, Appellant had personal liability on the

---

*Sauer Inc. v. Lawson* endorsed such an approach. (citing *Husky*, 136 S.Ct. 1581 (2016); and *Sauer Inc. v. Lawson (In re Lawson)*, 791 F.3d 214 (1st Cir. 2015).

[87] *In re Lombard*, 2017 WL 4857416 at *2.
[88] *Id.*, at *3.
[89] *Id.*, at *4.

debt to Frost, but that liability was on a non-fraud ground.  Therefore, Frost had to establish some ground to pierce the corporate veil of LB, but it failed to make any such veil-piercing allegations.  Frost's attempt to "cure" its deficiency at trial fails because of pleading deficiency.

**<u>Issue #2:  Whether the Bankruptcy Court erred in finding that Appellant made any knowing false representations to Appellee</u>**

77.     The Bankruptcy Court concluded that Appellant's debt to Appellee "fits under false representations and actual fraud," thereby finding Appellant's debt to Appellee nondischargeable under § 523(a)(2)(A).[90]

78.     With respect to "false representations,"[91] the Bankruptcy Court found that "Mr. Lawrence made false representations to Frost Bank regarding the Borrowing Entity's, LB's, intent to honor its payment obligations and Mr. Lawrence's commitment to the success of LB—when, in fact, Mr. Lawrence intended to form the New Entity and file bankruptcy for himself and the Borrowing Entity."[92]

79.     Importantly, the only allegedly false representation that Appellee identified in its Complaint was alleged misrepresentations in Appellant's bankruptcy schedules and statement of financial affairs – all of which postdated any of the conduct on which Appellee relies in giving rise to its cause of action.[93]  Plaintiff's disclosures failed to mention this as an issue.  The pre-trial order similarly included no reference to allegedly false representations other than the same reference to Appellant's bankruptcy schedules.[94]  Appellant repeatedly objected to evidence and issues raised by Appellee at trial that fall outside of Appellee's Complaint.[95]

---

[90] R. 72 (¶15).

[91] The "actual fraud" finding is addressed, *infra*, at Issue #14.

[92] R. 72 (¶16).

[93] R. 110 ("47.  Defendant made knowing and false representations in his Schedules and SOFA, when he failed to disclose his receipt of the Collateral and the proceeds of the Collateral into the LB Commercial Roofing, LLC account at Wells Fargo bank (1301), and into his personal account at Wells Fargo Bank (5286). The false representations made in Defendant's Schedules and SOFA were made under oath and were made with the intention to deceive Frost Bank, and all other creditors of Defendant. Frost Bank relied on the representations made in Defendant's Schedules and SOFA, and such reliance caused harm and damage to Frost Bank."

[94] 2nd Supp. R. 803.

[95] *See, e.g.,* R. 339 (Appellant's opening statement, "We would encourage the Court to limit its focus to the pleadings."); R. 453 (Objection to evidence related to intangibles as outside the pleadings); R. 935 (Appellant's closing argument:  "As a preliminary matter, I want to urge this Court to hold Frost to its pleading. Frost has attempted on several occasions now to expand their pleadings, . . .").

80.     Even if the supposed misrepresentations found by the Bankruptcy Court were properly pled, the evidence in the record does not support this finding.

81.     The purported representations derive from a meeting held on or about February 10, 2017, between Appellant and Appellee's representative (the "**February 10, 2017 Meeting**").[96]

82.     The stated purpose of the February 10, 2017 Meeting was "to discuss the transition of the Borrowing Entity's three pending loans to the 'Special Assets' department of Frost Bank."[97]  The loan had been transferred to Special Assets in January, 2017[98] based on Appellee's acknowledged concerns regarding the loans to Appellant.  As stated by Mr. Michael Fleming ("**Fleming**"), Appellee's representative, a loan's transfer to Special Assets "means that the bank would have identified negative trends with the company, . . . [including] loss in revenue, loss in net income, negative trends  with its ratios on the balance sheet, things of that nature."[99]  Specifically, Appellee acknowledged that LB, the Borrowing Entity, had a net loss for 2016 of $295,000.00.[100]  Similarly, Appellee acknowledged the drastic decrease in revenue that LB experienced from 2015 to 2016—from "somewhere in the 3 million range in 2015 to over $300,000 in 2016."[101]

83.     Appellee even admitted that it knew that Appellant was insolvent at the time of the February 10, 2017 meeting.[102]  Despite that background of clearly troubled loans, the Bankruptcy Court found that Appellant made a material misrepresentation when he allegedly "made representations that he was committed to the success of the

---

[96] This meeting is described by the Bankruptcy Court's Findings of Fact at ¶¶12-30, R. 50-53.
[97] R. 50 (¶12).
[98] R. 467 (95:16-17).
[99] *Id.* (95:21-24).
[100] R. 467-68 (95:25-96:5).
[101] R. 468 (96:6-11).
[102] R. 50 (¶15).

Borrowing Entity."[103]

84.    The Bankruptcy Court further found that Appellant "anticipated being able to pay off the debt early to Frost Bank, specifically, before the end of the year."[104]

85.    For the purpose of analysis, Appellant will break down every instance where the Bankruptcy Court finds that Appellant made a representation:

(1) "Mr. Lawrence expressed to Mr. Fleming that he had a good relationship with the general contractor and that Cresta was making timely payments."[105]

86.    The Bankruptcy Court's representation regarding a "good relationship" derives from the following Q&A:

> [R. 422 (50:21-25)]
> Q. Did Mr. Lawrence talk to you about his interest in Lawrence
>     Built, LLC just with respect to his desire to continue to
>     operate the business?
>
> A. Well, that's a part of my meeting with every customer that I
>     have, is to try to get a feel for how committed they are to it.
>
> [R. 423 (51:1-3)]
> You know, based upon my conversation with him that he was
> bidding jobs, that he had good relationships with his GCs, I got
> the impression that he expected for his business to improve.

87.    Mr. Lawrence never stated at trial that he had a good relationship with general contractors, but that's hardly a material representation.  And more importantly, there's no evidence that such representation is false.  Indeed, Appellee failed to assert in its pleadings or anywhere else that Appellant's relationship with general contractors was a false representation.

---

[103] R. 53 (¶28).
[104] *Id.*
[105] R. 51 (¶17).

88.     Faced with clear and accurate evidence of LB's financial condition, even if Appellant had misrepresented the quality of his relationships with general contractors, this is hardly a representation on which Appellee could reasonably rely.

89.     As to timely payments, Appellant directly refuted the notion that Cresta was paying timely or that he had ever suggested otherwise.[106]  But timeliness of a customer's payment is similarly not a material representation.  Nor is it a representation on which Appellee could reasonably rely in determining whether to renew a loan.  And once again, Appellee did not assert in its pleadings, nor does the pre-trial order reflect,[107] that the timeliness of payments by Appellant's customers was a false representation giving rise to its cause of action.[108]

(2)  "Mr. Lawrence made representations that he expected to get paid from [the Cresta Construction] project and that some proceeds from Cresta Construction accounts receivable would go towards servicing the debt of Frost Bank."[109]

90.     The Court misrepresents the testimony in this finding.  When asked by his own counsel about payments coming from Cresta Construction, Fleming stated that, "[t]he **expectation** is that some of those proceeds would go towards servicing the debt that was owed to Frost Bank"[110] (emphasis added).  Fleming did not allege that Appellant stated that certain proceeds would be used to service the Frost Bank debt.  Mr. Fleming simply stated his own personal expectation regarding use of proceeds.

---

[106] *See* R. 771 (398:17-399:8).
[107] 2nd Supp. R. 796-823.
[108] Note that, if Appellee had raised the issue of misrepresentations other than the schedules, Appellant would have conducted further discovery – namely taking the deposition of Fleming.
[109] R. 51 (¶19).
[110] R. 420 (48:2-6).

91.    More importantly, the undisputed trial testimony reflects that Appellant did in fact receive a payment from Cresta, and that he did in fact use it towards servicing the Frost Bank debt.[111]   Therefore, it is undisputed that this entire statement is true.

(3) "Mr. Fleming credibly testified that the Debtor represented that he was actively bidding other jobs."[112]

92.    The Court found that Appellant represented to Appellee that he was actively bidding jobs.  Appellant acknowledged that he was, indeed, actively bidding jobs,[113] and even Appellee acknowledged that Appellant was in fact actually bidding jobs.[114]

93.    Therefore, it is undisputed that this representation was true.

(4)  "Amortization was created based on the Debtor's representation regarding how much the Borrowing Entity could pay a month to Frost Bank."[115]

94.    The Court misrepresents the trial testimony in this finding too.  Nowhere in the record is there support for the idea that Appellant represented that he could pay $3,000.00 per month.  Instead, Fleming testified that the $3,000.00 per month figure was arrived at based on a 48-month amortization – which was not a term Appellant requested. Quite to the contrary, Mr. Fleming testified that he could not remember what dollar amount Appellant gave him.[116]  Shortly before that, Fleming acknowledged that Frost wanted a shorter amortization, and Appellant wanted a longer amortization.[117]  And Frost

---

[111] *See* Exh. FB-51, 2nd Supp. R. 536-37 (Check from Cresta Construction endorsed over to Frost Bank).
[112] R. 51 (¶20).
[113] R. 772 (399:9-15).
[114] R. 425 (53:6) (from Mr. Fleming, Appellee's representative, "Well, he was actually bidding jobs.")
[115] R. 52 (¶26).
[116] The trial testimony is as follows:

     [R. 422 (50:11-16)]
     Q.  Did – did you ask Mr. Lawrence how much he could pay a month if the bank had decided to renew the loan?
     A.  I did.
     Q.  And what did he tell you?
     A.  I can't remember the exact dollar amount that he gave me, but we ended up coming up to around $3,000.00.
[117] R. 422 (50:6-8).

had access to the best evidence of what Appellant could afford to pay:  the undisputedly true revenue projections that Appellant provided to Appellee.

95.     In any event, a representation of the ability to pay $3,000.00 per month could have been reasonable based on the projected work that Appellant believed he was going to get.[118]

96.     Appellant testified about nearly $500,000.00 in work that was lost when a prospective customer—CLA—filed for bankruptcy,[119] combined with the failure of another customer—ARC—to pay approximately $50,000.00[120] that was owed.[121]

(5)  " . . . the Debtor expected to service the debt of Frost Bank with contracts on the accounts receivable aging summary and projections"[122]

97.     Yet again, the court misrepresents the trial testimony in this finding.  First, the finding suggests that Appellant made a representation regarding servicing of the debt, and that is simply not true.  The only testimony that comes close to such a representation is testimony from Fleming regarding his conversation with Mr. Lawrence.  But not even Fleming indicates in any testimony that Mr. Lawrence made a representation regarding servicing the debt with contracts on the accounts receivable aging summary and projections.[123]

---

[118] R. 773 (400:9-11):

> Q. What did you tell Mr. Fleming regarding business improving in the near future, if anything?
> A. Probably that it was hopeful.  I mean much with respect to what we were talking about before, if you've got $800,000 in, you know work lined up, it looks – looks hopeful.

[119] R. 768-69 (395:21-396:14).
[120] R. 763 (390:7-21).
[121] R. 770 (397:7-17)
[122] R. 52-53 (¶27).
[123] R. 423-26 (51:17-54:2), as follows:

> Q. . . . With respect to the inventory and accounts of Lawrence Built, did Mr. Lawrence make any representations to the bank about the accounts receivable that would have caused Frost Bank to agree to execute this commercial security agreement?
>
> A.  He had filed - he filed an accounts receivable summary and his projections.

98.     Even if this testimony could somehow be read to imply that Appellant intended to make payments with income from accounts receivable and future income, the uncontroverted evidence shows that a significant amount of accounts receivable was not collected and that a significant amount of expected revenue fell through.[124]

(6) "The Debtor told Mr. Fleming that he anticipated being able to pay off the debt early to Frost Bank, specifically, before the end of year."[125]

99.     As reflected in the cited testimony immediately above, Appellant **did not** testify that he anticipated being able to pay off the debt early. As reflected even in Fleming's testimony, Mr. Lawrence was only alleged to have stated that he "hoped" to get the indebtedness paid off before the end of the year—hardly a misrepresentation and certainly not one on which Appellee could justifiably rely.

(7) "Mr. Lawrence made false representations to Frost Bank regarding the Borrowing Entity's, Lawrence Built's, intent to honor its payment obligations and Mr. Lawrence's commitment to the success of Lawrence Built – when, in fact, Mr. Lawrence intended to form the New Entity and file bankruptcy for himself and the Borrowing Entity."[126]

---

. . .

Q. Mr. Fleming, a couple more things and with respect to the business. Did Mr. Lawrence - make with respect to future jobs, what did - what did Mr. Lawrence tell you about how he's obtaining those future jobs for the benefit of Lawrence Built, LLC?

A. Well, he was actually bidding jobs. We did have a conversation of how he obtains some of his current work and some of his current contracts. And it's my understanding that some of those contracts with contracts were those customers that he was working with were provided to him by his father.

. . .

Q. Did Kyle Lawrence tell you he anticipated that he could pay the debt off early to Frost Bank?

A. He did.

Q. Tell me what he said about that.

A. He said that he expected business to improve and that **he had hoped to get the indebtedness paid off before the end of the year**. [Emphasis added]

[124] *See, supra,* ¶96.
[125] R. 53 (¶28).
[126] R. 72.

100.    To start, this alleged representation is a statement regarding Appellant's financial condition and therefore cannot be the basis of a misrepresentation for purposes of nondischargeability.[127]

101.    To the extent such statements are not statements about Appellant's or his business's financial condition, they are mere "puffing"[128] and do not represent actual material representations—certainly not ones on which Appellee could reasonably rely.

102.    In any event, Appellee did not establish that these statements were not true at the time made.  Once again, the alleged representations occurred at or immediately following the February 10, 2017 meeting between Appellant and Fleming.  It was not until two months later that Appellant testified that he met with a bankruptcy attorney and determined that a bankruptcy filing was his best course of action.[129]  Therefore, there is no evidence in the record to suggest that Mr. Lawrence was not fully committed to the success of LB as of February 10, 2017.  Nor is there any evidence that Mr. Lawrence did not fully intend to honor his and his business's obligations as of February 10, 2017.

(8) "Mr. Lawrence knowingly created a false impression of the true facts. Mr. Lawrence represented to Frost Bank that he expected to receive funds from construction projects in which the Borrowing Entity, Lawrence Built, was engaged, and that these funds would be used towards the indebtedness owing to Frost Bank."[130]

103.    This alleged representations is simply a restatement of the alleged representation made in (5) above.  Analysis of (5) is hereby incorporated by reference as if fully laid out herein.

(9) "He even represented that he hoped to pay off the debt early"[131]

---

[127] *See* 11 U.S.C. § 523(a)(2)(A).
[128] *See* discussion re- "puffing", *infra*.
[129] R. 783-84 (410:22-411:7).
[130] R. 73 (¶17).
[131] *Id.*

104.     As addressed elsewhere, hoping to do something does not equate to making a false representation that one will actually do something, nor could it be reasonably relied upon given Appellee's knowledge of LB's financial condition. *See supra,* n. 122.

105.     The Bankruptcy Court's findings regarding Appellant's supposed intent— "as inferable from his acts shortly after the meeting with Frost Bank"—ignores intervening events.  Namely, Appellant sought counsel from an attorney in April, 2017— well after the February 10, 2017, meeting.[132]  And it was only after that April meeting that he concluded that he and LB would be unable to satisfy their obligations to Frost Bank and that bankruptcy was his best option.[133]

106.     There is no evidence in the record to support that Appellant knew at the time of any representation made to Appellee that any such representation was false. Moreover, the alleged misrepresentations on which the Court relies relate to Appellant's financial condition.  Therefore, such statements are required to be in writing in order to qualify for misrepresentations that give rise to a non-dischargeability finding.[134]  *See Blackwell v. Dabney*, 702 F.2d 490 (4th Cir., 1983) (holding that statements were oral statements concerning the debtor's financial condition).

---

[132] R. 783-84 (410:22-411:7).

[133] R. 783 (410:14-21); R. 784 (411:2-5).

[134] *See* 11 U.S.C. § 523(a)(2)(A) (". . . other than a statement respecting the debtor's or an insider's financial condition").  In the context of a conversation between Appellant and Frost Bank, if Appellant made the statement that he was committed to the success of Lawrence Built, it would have only been in connection with its financial condition.  As stated by the Bankruptcy Court, "The pertinent false statements were the representations that the Debtor was committed to the success of the Borrowing Entity and anticipated paying off its debts to Frost Bank early, when the Debtor obviously had different intentions."

It could not be any clearer that Appellant's alleged oral statements – to the extent they were actually made – relate to the financial condition of Lawrence Built, and therefore cannot be the basis of a nondischargeability finding under 11 U.S.C. § 523(a)(2)(A).

107.    Appellant's statements are virtually identical and similarly represent statements regarding Appellant's or his business's financial condition and therefore are not actionable.

Any Representations Made by Appellant Were Mere Puffing

108.    The Bankruptcy Court found that Appellant made misrepresentations to Appellee when he:  (1) Expressed his commitment to the success of the Borrowing Entity; (2) Indicated that he hoped to pay off the debt early; and (3) Intended to honor his payment obligation.

109.    To the extent that these statements are not statements regarding Appellant's financial position and to the extent they are not actually true, these statements constitute mere "puffing" that is not actionable.

110.    "Puffing" is the expression of an exaggerated opinion, as opposed to a factual misrepresentation.  Courts have consistently held that statements constituting mere "puffing" cannot serve as the basis of a § 523(a)(2)(A) claim.[135]

---

[135] *See, e.g., Malekan v. Etesamnia (In re Etesamnia)*, Cause No. 13-01695 (B.A.P. 9th Cir., 2015); *In re Escalante v. Escalante*, Cause No. 10-01147 (Bankr. N.M., 2011); *Augustine v. Pare*, Adv. Proc. No. 09-00173 (Bankr. Md., 2010); *In re Cozart*, No. 5:08-bk-73392 (Bankr. W.D. Ark. May 5, 2009) ("Cozart's statements could be considered to be nothing more than 'puffing' or promotion. Any such statements should not be blindly accepted; a [recipient of such statements] should generally be skeptical of such statements without independent verification"); *In re Barr*, 194 B.R. 1009 (Bankr. N.D. Ill, 1996); *Alvine v. Keller (In re Keller)*, 72 B.R. 599 (Bankr. M.D. Fla. 1987).

**Issue #3:  Whether the Bankruptcy Court erred in finding that Appellee justifiably relied on any representations found to have been made by Appellant**

111.    As noted in more detail above, the Bankruptcy Court found that Appellant made a number of oral misrepresentations.  *See, supra,* Issue #2.  But the caselaw is clear that reliance under § 523(a)(2)(A) must be "justifiable."[136]

112.    Despite these alleged misrepresentations, the Bankruptcy Court acknowledged that Appellant provided accurate written documentation at the February 10, 2017 meeting with Appellee.[137]  Even assuming the Bankruptcy Court was correct that Appellant made oral misrepresentations, the availability to Frost of accurate written financial records makes any reliance on those statements unjustifiable.  At trial, Appellee's representative acknowledged that LB, the Borrowing Entity, had a net loss for 2016 of $295,000.00, which was reflected in that written documentation.[138]  Similarly, Appellee acknowledged the drastic decrease in revenue that LB experienced from 2015 to 2016 – from "somewhere in the 3 million range in 2015 to over $300,000 in 2016"—also reflected in the written documentation provided.[139]  Appellee even admitted that it knew

---

[136] *Lamar, Archer & Cofrin, LLP v. Appling*, 138 S.Ct.1752, 201 L.Ed.2d 102 (2018); *Field v. Mans*, 516 U.S. 59, 61, 70-75; *Matter of Mercer*, No. 98-60693 (5th Cir., 2000).  Professors Keeton and Prosser (cited with approval by the U.S. Supreme Court in Field) discuss the justifiable reliance factor, stating:

> The other side of the shield is that one who has special knowledge, experience and competence may not be permitted to rely on statements for which the ordinary man might recover, and that one who has acquired expert knowledge concerning the matter dealt with may be required to form his own judgment, rather than take the word of the defendant.  *W. Page Keeton et. al., Prosser and Keeton on the Law of Torts* § 108, at 751 (5th ed. 1984). Furthermore, as Justice Ginsburg, concurring, pointed out, the creditor must prove not only that he "justifiably relied", but also that the money was "obtained by" (i.e., the loan of money was caused by) the alleged misrepresentation. *Field*, 516 U.S. at 78 (Ginsburg, J., concurring).

The treatise goes on,

> "Justifiable reliance is something more than actual reliance, but less than reasonable reliance, depending on the creditor. With respect to the subjective element of justifiable reliance, the [*Field*] Court stated that 'the matter seems to turn upon a plaintiff's own capacity and the knowledge which he has or which may fairly be charged against him from the facts within his observation in the light of his individual case.' *Field*, 516 U.S. at 72 (citing W. Prosser, Law of Torts § 108, at 717 (4th ed. 1971)).

[137] R. 73 (¶18).
[138] R. 467-68 (95:25-96:5).
[139] R. 468 (96:6-11).

---

that Appellant was insolvent at the time of the February 10, 2017 meeting.[140]

113.    Indeed, the very reason that Fleming was involved at all and that the February 10, 2017 Meeting occurred was that the LB loans had been placed with the Special Assets Division of Appellee.

114.    Fleming further acknowledged that he knew before the February 2017 meeting that LB had taken out a separate secured loan from Fundation.[141]

115.    All these facts of which Appellee was clearly aware put it on notice of Appellant's financial condition and make it simply implausible that Appellee could have reasonably relied on the oral representations of Appellant.

116.    The Bankruptcy Court found that Appellee "justifiably relied on Mr. Lawrence to its detriment, by not exercising its right to pursue collection remedies with regard to the Original Note, after the February 10, 2017 meeting," but the Bankruptcy Court fails to identify any tangible value that Appellee could have obtained had it chosen to do so.  That's because there was nothing to get; there's certainly nothing in the record to suggest otherwise.

117.    Further, Frost is a sophisticated financial institution whose job it is to determine in situations like this whether or not a debtor is going to be able to satisfy their loan obligations.[142]  It was clear at the February 10, 2017 Meeting that LB was going to have a difficult time satisfying its obligations:  drastically reduced accounts receivable; drastically reduced income; insolvency.  Importantly, the trial court acknowledged the

---

[140] R. 50 (¶15).

[141] R. 415 (43:15-16) (Fleming researched UCC's prior to the February, 2017 meeting); R. 493-94 (121:24-122:9) (Fleming found the Fundation UCC during his UCC search).

[142] Fleming has worked at Frost for eleven years (R. 394 (22:9-10)), and Frost has been represented by the same counsel for 19 years (R. 452 (80:15-18)).

accuracy of the information presented by the Appellant in the meeting with Frost.[143]

118.    The Bankruptcy Code demonstrates a clear preference to written documentation when it comes to representations about a debtor's financial condition.[144] A Debtor's statement about his intent or desire to pay a particular debt cannot trump accurate financial documentation, and a creditor cannot be excused from its obligation to review financial documentation.

119.    In this case, Frost did just that and determined that it was unlikely to obtain any recovery if it called the loans in February, 2017.  Instead, Frost made a calculated decision to extend the loan to LB—not because of any representations made by Kyle Lawrence—but because its alternatives were virtually non-existent.

120.    To the extent that this Court finds that Appellant made any false representations, it should find that the Bankruptcy Court erred in finding that Appellee could have reasonably relied on such representations when faced with accurate financial information that any reasonable person would have found far more indicative of Appellant's ability to satisfy his and the Borrowing Entity's obligations.

---

[143] *See* R. 73 (¶18).
[144] *Cf.* 11 U.S.C. § 523(a)(2)(A) with § 523(a)(2)(B).

**Issue #4:   Whether the Bankruptcy Court erred in dismissing Appellant's
counterclaim regarding the discharge injunction violation represented by Appellee's
state court lawsuit against LB Commercial Roofing, LLC – which sought to collect
the same debt**

121.   In *Defendant's Original Answer and Counterclaim,*[145] Appellant asserted

a counterclaim against Appellee for a violation of the Discharge Injunction and/or

Automatic Stay based on the filing of its state court action against LBCR (the "**State

Court Action**"), an entity created by Appellant following his decision to discontinue

LB's operations.[146]

122.   Subsequently, Appellant sought to amend his counterclaim by filing his

*Motion for Leave* to expand the scope of the discharge injunction violation cause of

action.[147]

123.   Appellant subsequently received his discharge on July 5, 2018.[148]

124.   On November 8, 2018, the Bankruptcy Court denied *Appellant's Motion

for Leave* and dismissed Appellant's counterclaim.[149]

125.   In the State Court Action, it is undisputed that Frost seeks to recover on

the same debt for which it sought nondischargeability pursuant to the adversary

proceeding the subject of this appeal.[150]

126.   Section 362(a)(1) of the Bankruptcy Code provides that actions "against

the debtor" or "'to recover a claim against the debtor" are subject to the automatic stay.

---

[145] *See* R. 144, *et seq.*

[146] R. 155-56 (¶¶79-87).

[147] R. 179.  A copy of the Original Petition filed in the State Court Action on June 20, 2018 was attached to the proposed *First Amended Answer and Counterclaim.  See* R. 263-314.

[148] R. 1323 (Exhibit S, Dkt. #73); the Bankruptcy Court took judicial notice of the Appellant's discharge, R. 853 (479:13-18).

[149] R. 330-31; 334-35.  *See also* 1st Supp. R. 16-70 (transcript of November 5, 2018 hearing that culminated in the November 8, 2018 orders).

[150] *Cf., e.g.*, Exhibits A-D to the State Court Petition (R. 287-301) to Exhibits 1-4 to Appellee's Complaint in the adversary proceeding the subject of this appeal (R. 116-130).  Exhibits clearly reflect the same debt.

The latter category encompasses cases in which the debtor is not a defendant.[151]

127.    Section 524 of the Bankruptcy Code provides that a discharge in a case under Title 11 "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect or recover from, or offset against, property of the debtor."  The same logic applies in the case of the discharge injunction. *See id.*

128.    In the State Court Action, Frost seeks to recover  a claim against LBCR. The petition filed by Frost in that case specifically alleges that LBCR is liable to Frost as a result of loans made by Frost to LB.  Thus, if LBCR were not liable to Frost on Frost's loans to LB, Frost would have no independent claim against LBCR.

129.    As a result, although the State Court Action is not an "act to obtain possession of property of the estate" within the meaning of § 362(a)(3) or an "action . . . against the debtor" within the meaning of § 362(a)(1), it is an "action . . . to recover a claim against the debtor" within the meaning of § 362(a)(1).

130.    The Bankruptcy Court erred in dismissing Appellant's counterclaim, as the State Court Action is clearly an attempt to collect the same debt as it sought to collect from the Appellant in the underlying adversary proceeding

---

[151] *See, e.g., In re Colonial Realty Co.*, 980 F.2d 125, 131 (2nd Cir. 1992) ("A third-party action to recover fraudulently transferred property is properly regarded as undertaken 'to recover a claim against the debtor'" [citing § 362(a)(1)]).

**Issue #5:  Whether the Bankruptcy Court erred in dismissing Appellant's
affirmative defense of offset and credit**

131.    At the same hearing held on November 5, 2018 at which the Bankruptcy

Court dismissed Appellant's counterclaim, it also struck all of Appellant's affirmative

defenses.

132.    Appellant alleges herein that the Bankruptcy Court incorrectly calculated

Appellee's damages – to the extent that it had any damages.

133.    Appellant alleges, as more fully discussed in Issue #9, *infra*, that the

Bankruptcy Court incorrectly calculated Appellee's damages as simply the face amount

of the notes.  Assuming, *arguendo*, that LBCR received payments that properly belonged

to LB, the proper amount of damages to Frost Bank should be determined with reference

to the amount that LBCR ultimately ended up retaining.  The amount of revenue,

therefore, must be reduced by expenses legitimately incurred by LBCR in performing the

services leading to the payments (such expenses being authorized under the LB loan

documentation).[152]

134.    To the extent this Court finds that allowance of expenses incurred is an

affirmative defense that must be pled, Appellant notes that it pled "offset and credit" as

part of its *Original Answer and Counterclaim*.[153]

135.    However, with little to no explanation, the Bankruptcy Court dismissed

Appellant's affirmative defenses.[154]

136.    The Bankruptcy Court erred in striking all of Appellant's affirmative

---

[152] *See* FB-2, FB-3, and FB-5, 2nd Supp. R. 4, 10, and 19, respectively (security agreement provisions regarding "Grantor's Right to
Possession":  "Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and
may use it in any lawful manner not inconsistent with this Agreement or the Related Documents . . ."
[153] *See* R. 154 (¶69).
[154] *See* R. 332-333; 1st Supp. R. 70 (55:6-16).

defenses—including the affirmative defense of offset and credit.

**Issue #6:  Whether the Bankruptcy Court erred in finding that any payments to Appellant constituted the collateral of Appellee**

137.    Appellee's Complaint identifies five checks that it alleges are its collateral.[155]

138.    Specifically, Appellee's Complaint alleged that the following constituted its Collateral under the loans to LB:[156]

➔ Check #1:  $232,006.90 issued by CTC on or about July 10, 2017;[157]

➔ Check #2:  $2,508.51 issued by Cresta on or about July 13, 2017;[158]

➔ Check #3:  $9,081.00 issued by Trinity Transcon, LLC on or about July 17, 2007; [159]

➔ Check #4:  $116,003.45 issued by CTC on or about November 1, 2017;[160] and

➔ Check #5:  $197,862.93 issued by CTC on or about December 8, 2017.[161]

Checks #4 and #5

139.    Starting with Checks #4 and #5, these checks were both, on their face, received long after the petition date of Appellant's underlying bankruptcy case—July 30, 2017.[162]  Therefore, any debt related to an alleged fraudulent transfer scheme would not be discharged in Appellant's bankruptcy and therefore cannot be excluded from discharge (because it was never *included* in the discharge).  Notably, Appellee did not prosecute its claim with respect to Checks #4 and #5 at trial.

---

[155] R. 105-107 (¶30-36 therein).

[156] As discussed more fully in the context of Issue #12, *infra*, the Bankruptcy Court erred in considering any payments other than those alleged in Appellee's Complaint.

[157] R. 105-106 (¶30).

[158] R. 106 (¶31).

[159] R. 106 (¶32).

[160] R. 107 (¶35).

[161] R. 107 (¶36).

[162] R. 1315 (Dkt. #1).

<u>Check #1</u>

140.    As to Check #1, the evidence shows that Check #1 was never intended for LB and that LBCR performed the actual work. [163]

141.    Appellant's uncontroverted testimony is consistent with such intent. [164]

142.    Perhaps more importantly, Ron Tivis, the Director of operations at CTC testified to that effect.[165]

143.    Mr. Tivis was asked questions regarding an e-mail that he sent to David Elmquist, the chapter 7 trustee over the LB bankruptcy, identified at trial as Exhibit G.[166]

144.    Importantly, this e-mail was sent to Mr. Elmquist at a time that Mr. Tivis had already assumed his role as Director of Operations (as reflected in his signature box that included his title in the e-mail).  Testimony elicited in an offer of proof makes it even clearer that CTC intended to pay LBCR, not LB.[167]  Tivis also clarified that all four checks were issued with respect to the same contract.[168]  Consistent with Appellant's and Ron Tivis' stated intent, LBCR deposited the checks from CTC into its account and

---

[163] R. 787 (414:19-21); R. 805 (432:2-5, 17-18); Note also that Fleming admitted that he had no personal knowledge as to who performed the work for any of the projects.  *See* R. 474 (102:14-20); *see also* R. 697 (324:19-20) (Tivis testimony regarding erroneous payee with respect to Check #1); R. 999 (326:6-13) (Tivis testimony regarding erroneous payee with respect to Check #2); R. 700-701 (327:19-328:9 and 328:25-329:4) (Tivis testimony regarding erroneous payee with respect to Check #3); R. 704 (331:6-21) (Tivis testimony regarding corrected payee on Check #4).

[164] *See, e.g.,* R. 805 (432:2-10, 17-18); R. 810 (437:19-23).

[165] *See, e.g.,* R. 684 (311:15-21) (Cross Timbers intended to pay the entity represented by the W-9); the W-9 presented was LBCR's (*see* Exh. O and testimony confirming that Exh. O represents the W-9 of LBCR, R. 729 (356:1-5)).

[166] See Exh. G at R. 1116-1119.  The following Q&A answer ensued:

> [R. 709 (336:17-24)]
>
> Q. Okay.  By this e-mail, what were you attempting to do?
>
> A. We had received the email from Mr. Elmquist requesting support documentation in regards to the bankruptcy and we complied to that request.
>
> Q. So by this email were you attempting to explain what we had discussed, namely, that three of the four checks were inadvertently made payable to the wrong entity?
>
> A.  Yes, sir.

[167] R. 697-704 (324:6-331:22).

[168] R. 704 (331:25-332:3).

claimed the income on its tax return.[169]

145.    If it is established that both parties to an agreement intended a particular result, then that a third party—in this case Frost Bank—has no standing to recharacterize that understanding.[170]

Check #2

146.    With respect the Check #2, the evidence once again does not support that the payment from Cresta was ever intended to be paid to LB.  Further, the evidence also shows that Frost was subsequently paid over $21,000 for work that was performed by LBCR, and to which Frost was not entitled.[171]

147.    To the extent the $2,508.51 represented by Check #2 belonged to LB, it was more than offset by amounts subsequently paid.  And it was offset by expenses validly incurred in performing the work.[172]

148.    LBCR also performed warranty work for Cresta that allowed the $21,000 to be paid in the first place.[173] LBCR was not paid for the warranty work, and as it was work that occurred after LB filed for bankruptcy, it was not work that LB could have performed.

Check #3

149.    Check #3, too, did not belong to LB.

150.    The agreement with Trinity Transcon was always with LBCR, not LB, and

---

[169] *See* Exh. M (LBCR 2018 Tax Return) at R. 1228-1240; Exh. N (LBCR Income Detail), at R. 1241-1242);  *see also* R. 727 (354:1-13) (Exh. N, which includes income from Cross Timbers Church, represents all of the income for LBCR for 2017).

[170] *See, e.g., Royston, Rayzor, Vickery & Williams, LLP v. Lopez*, 467 S.W. 3d 494, 503-04 (Tex. 2015) ("[only] the parties to an agreement determine its terms").

[171] *See* Exh. FB-36 at 2nd Supp. R. 271-72.

[172] R. 825-26 (452:22-453:5).

[173] R. 847-48 (473:15-474:10).

LBCR performed the work.[174]

151.    The only evidence otherwise was a mistaken identification in one of the pay applications.  Every other pay application listed the payee in a way that distinguished it from LB.[175]

---

[174] R. 813 (440:10-12).
[175] *See* R. 818-24 (445:9-451:13).

**Issue #7:  Whether the Bankruptcy Court erred in finding that the accounts receivable was the "asset transferred" as opposed to the project contract**

152.    The Bankruptcy Court found that Appellant diverted revenue from the Cresta project,[176] the Trinity Transcon project,[177] and the CTC Project.[178]

153.    Curiously, however, the Bankruptcy Court apparently ignored the fact that LBCR, the new entity, not only performed the work, but also incurred significant expenses in performing the work.

154.    While Appellant contends that no such transfer occurred, to the extent that any transfer occurred, the "transfer" was of the project contract rather than only the revenue.  In the parlance of fraudulent transfers, LB received equivalent value for any such transfer it made – because it was relieved of the obligation to perform.

155.    The Bankruptcy Court erred by treating the asset transferred as only the accounts receivable rather than the entire project contract – which would more accurately reflect what was "transferred," if anything.

---

[176] R. 19-22 (¶¶44-58).
[177] R. 23-24 (¶¶59-68).
[178] R. 25-28 (¶¶69-86).

**Issue #8:  Whether the Bankruptcy Court erred in finding that the agreement with Cross Timbers Church was with Lawrence Built, LLC, instead of with LB Commercial Roofing, LLC**

156.    As noted above (*see* ¶¶140-51), the uncontroverted evidence in the form of the testimony of both Appellant and the Director of Operations of CTC is that the agreement in question was between CTC and LBCR.[179]

157.    As a third party, Frost Bank has no standing to contest the understanding between two consenting parties.[180]

158.    If the agreement was between CTC and LBCR, the receivables generated by the performance of work for CTC belong to LBCR and are not the collateral of Appellee.

159.    The Bankruptcy Court erred in finding that the agreement with CTC was with LB instead of LBCR.

---

[179] Appellant notes that, more broadly, the evidence in the record is uncontroverted that LBCR performed all of the work that was the subject of allegedly converted accounts receivable.  Not once did a party to an agreement to perform roofing services contradict Appellant's testimony regarding who performed work.

[180] *See, supra*, n.169.

**Issue #9:  Whether the Bankruptcy Court erred in its finding and calculation of damages**

160.    As alluded to above, the Bankruptcy Court erred in its finding and calculation of damages, to the extent they exist at all.  The Bankruptcy Court's assessment of damages focuses solely on revenue and ignores expenses incurred in obtaining such revenue.  Hypothetically, if, instead of renewing the loans with LB, Frost had instead chosen to call the loans, it would not have received the full amount of any of Checks 1-5.

161.    At no time would Frost have been entitled to collect all revenue and ignore expenses incurred in creating such revenue.

162.    The loan documents authorize the borrower (*i.e.*, LB) to "have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with [the loan] Agreement."[181]  Frost did not establish that it ever had the immediate right to possession of the checks in question.

163.    Appellant introduced a multitude of evidence that it incurred expenses in acquiring the project revenue.  Such expenses should serve to reduce any damages found to have been incurred by Appellee.[182]

164.    Appellee also established no damages with respect to vehicles that it contended were not returned quickly enough upon demand.[183]

---

[181] *See, supra*, n.151.

[182] *See, e.g.*, Exh. F (R. 1026-1155), which represents "all expenses paid by LB Commercial Roofing, LLC for the period from April 18th, 2017 to April 2nd, 2018" (R. 720 (347:10-13)).  Expenses reflected in Exh. F represent expenses directly related to jobs performed by LB Commercial Roofing, LLC (R. 721 (348:6-9)); R. 783 (410:2-4); R. 824 (451:14-16); R. 825 (452:22-24); R. 829 (p. 456:9-10); R. 847 (p. 473:7-8).  *See also* R. 734 (361:13-17) (LBCR only made $2,500.00 in net income on the Cresta re-skin project).

[183] Two of three trucks were admittedly returned.  R. 460 (88:25).  It is also undisputed and uncontroverted that Appellant turned over all of proceeds of the sale of the third truck to Appellee.  R. 744-45 (371:22-372:3) (Adams testimony); R. 773 (400:16-19) (Lawrence testimony).  Appellant's good faith, and the corresponding lack of damages, regarding the vehicles includes: (1) Mr. Lawrence's uncontroverted testimony that he continued to make payments on one of the vehicles (that he drove) after the bankruptcy (R. 786 (413:3-11); (2) Mr. Lawrence testified (R. 773), as did Debbie Adams (R. 740-745), that they received permission in the form of a payoff amount from Frost Bank.  (Despite Appellee's assertions to the contrary, there's not a single document in the record to support the contention that Appellant was supposed to have dealt only with the "Special Assets" division; (3) In any event, when the vehicle

165.    The Bankruptcy Court apparently found damages associated with the Cresta re-skin project.[184]  This is inappropriate for numerous reasons.  First, none of this work was referenced in the pleadings.  Second, all of the work performed for the re-skin project occurred after the Petition Date at a time when LB was incapable of performing.[185]  Third, once again, the amount failed to allow for expenses incurred in performing the project.  Finally, the uncontroverted testimony establishes that LBCR included this revenue in income and paid taxes on it.[186]  Additionally, Appellee established no damages as it relates to the alleged conversion of intangibles.  Appellant established that he owned the website and personally created the content on the website.[187]  He further established that he did not charge for any of the work he performed in creating the LB website.[188]  He further testified that the website had little more than personal value.[189]  Similarly, Appellant provided uncontroverted testimony that he personally owned the trademark and that it also had nothing more than personal value.[190]  Finally, Appellant provided uncontroverted testimony that his wife created the logo, that it was never owned by LB, and that it had no value.[191]

---

was sold, ALL of the proceeds were transferred to Frost Bank.  There was some discussion on the record as to whether Lawrence or Frost would have been able to obtain a higher amount, and it is simply common knowledge that an individual can realize a higher return in a private sale than a financial institution can by sending it to a wholesale auction.  It doesn't take expert testimony to establish that commonly-known fact.  Therefore, Kyle Lawrence's uncontroverted testimony is highly credible.  Frost's only response is that he wasn't supposed to do it – without any evidence of being harmed.  If Frost had been harmed, it could have put on evidence of its own to suggest that it would have obtained a much higher return on the sale of the vehicle.  It didn't do so; and  (4) Appellant voluntarily returned the other two vehicles.

[184] *See* R. 21 (¶53).

[185] R. 828 (455:1-4).

[186] *See* Exh. N (reflecting Cresta revenue as part of LBCR 2017 income); Exh. M (LBCR Tax Return in which gross receipts matches exactly to revenue from Exh. N); and Lawrence (R. 830) and Adams (R. 724-728) testimony regarding same.

[187] R. 848-849 (474:23-475:4).

[188] *Id.*, at 475:5-7.

[189] *Id.*, at 475:12-16.

[190] *Id.*, at 475:17-20.

[191] *Id.*, at 475:21-476-1.  Note also that the Security Agreement (*See* FB-8, Section C, at 2nd Supp. R. 32) makes clear that "general intangibles" is only collateral under the agreement if it "aris[es] out of a sale, lease, consignment, or other disposition of any of the property described in this collateral section."  None of the intangibles that Appellee addressed in its evidence – *i.e.,* the name, the logo, the trademark, the telephone number, the internet domain – arises out of a sale, lease, consignment, or other disposition of any of the property described in the collateral section.

166.    The Bankruptcy Court erred in ignoring evidence of expenses incurred in obtaining revenue when it calculated damages.

**Issue #10:  Whether the Bankruptcy Court erred in declaring the total amount of the contractual debt non-dischargeable where no alleged false representation was made prior to the execution of Note 1[192] and Note 2[193] (as defined in the Court's findings and conclusions)**

167.    Section 523(a)(2)(A) of the Bankruptcy Code unambiguously provides that a debt must be **obtained by** "false pretenses, a false representation, or action fraud. . . ." in order to be nondischargeable.  11 U.S.C. § 523(a)(2)(A).  The debts represented by Notes 1 and 2 undisputedly arose in February, 2016, and June, 2016.[194]

168.    The only misrepresentations alleged by Appellee or found to have occurred by the Bankruptcy Court all took place after the beginning of 2017.  It is axiomatic that debts cannot be "obtained by" future representations.

169.    For this reason alone, the Bankruptcy Court erred in finding the debts from Notes 1 and 2 were nondischargeable because they could not have been obtained by subsequent representations.

---

[192] *See* R. 10 (¶6).
[193] *See* R. 11 (¶8).
[194] R. 10-11 (¶¶6, 8).

**Issue #11:  Whether the Bankruptcy Court erred in finding any amount of the contractual debt non-dischargeable when no evidence of the outstanding balance of Note 3[195] was presented to the court**

170.    As the Court notes in its findings, "Note 3 was actually a renewal and replacement of the Original Note,"[196] which was issued on January 28, 2016.[197]  The trial court record is devoid of evidence regarding the balance of Note 3.

171.    Despite such glaring omission, the Bankruptcy Court found that $155,398.55 was collectively due and owing on Notes 1, 2, and 3.[198]

172.    Appellee's direct examination of the Frost Bank representative spans from pages 393 to 460, and not once did counsel for Appellee request, nor did the Frost Bank representative testify about, the outstanding balance of any note.

173.    The Frost Bank representative admits that numerous payments were made, including the $21,000 payment from Cresta, and he also admits that vehicles were turned over and the sale proceeds from the sale of those vehicles was applied to the loan.  But nowhere in the evidence is any sort of accounting that would support the amount of damages found by the Bankruptcy Court.

174.    At one point the Frost Bank representative testified that "principal interest and late fees" for notes 1, 2, and 3 totaled "approximately $168,000."[199]  However, the figure does not break down the amounts between or among principal and interest for the various notes, nor does it break out what was charged for "late fees" on the various

---

[195] *See* R. 12(¶10).
[196] *Id.*; *see also* R. 461-46 (p. 89:21-94:19).
[197] R. 10 (¶5); *see also* Exh. I at R. 1189-92.
[198] R. 32 (¶8).
[199] R. 451 (p. 79:13-16).

notes.[200]  Appellant has disputed the amounts owed throughout.

---

[200] Note that Frost Bank's demand letters and acceleration notice (*see* Exh FB-10 at 2nd Supp. R. 41-56) similarly does not have a breakdown of the outstanding balances of any of the notes.  In fact, neither the demand letters nor the acceleration notice provides any balances whatsoever – individual or cumulative.

**Issue #12:  Whether the Bankruptcy Court erred in allowing evidence outside the scope of the Complaint, specifically including any allegedly fraudulent act except the transfer of three checks**

175.    On numerous occasions, the Bankruptcy Court allowed the admission of evidence that is outside the scope of the Complaint.  Examples abound, and include:

> (1) Evidence related to checks/payments that were allegedly converted that were not referenced in the Complaint.  The Complaint specifically references five checks, two of which it did not argue at trial were converted.  The pre-trial order does not expand Appellee's claims.[201]

> (2) Evidence related to allegedly converted intangibles.  The Complaint makes no reference to allegedly converted intangibles.  Despite this omission, Appellee was wrongfully allowed to introduce evidence related to Appellant's telephone number,[202] website,[203] logo,[204] and trademark.[205]

176.    On multiple occasions, Appellant objected to such evidence and even mentioned the wrongfully expanded scope in both his opening and closing statements.[206]

177.    In overruling Appellant's objections to such evidence, the Bankruptcy Court pointed to the use of the general term "Collateral," in the pre-trial order and noted that the definition of "Collateral" in the loan documents includes intangibles.  However, that's hardly the kind of specificity that is required under Fed. R. Civ. P. ("**Rule**") 9.[207]

178.    It is difficult to imagine that a topic that was not even mentioned once in the pleadings can satisfy the "with particularity" requirement of Rule 9.

179.    The word "intangible" appears exactly once in Appellee's Complaint, and it appears in the context of a listing of what constitutes Appellee's collateral under the

---

[201] See 2nd Supp. R. 796-823 (pre-trial order).

[202] R. 652 (p. 279:10-17).

[203] R. 654-57 (p. 281:12-284:13).

[204] R. 663 (p. 290:4-10).

[205] R. 663, 664-67 (p. 290:11-19; 291:18-294:8).

[206] See, e.g., R. 389 (p. 17:20-18:6); R. 443 (p. 81:13-19); R. 627 (p. 255:4-24); R. 935-36 (p. 561:23-562:16).

[207] Fed. R. Civ. P. 9(b) (applicable to bankruptcy adversary proceedings pursuant to Fed. R. Bankr. P. 7009), provides that, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."

loan documents.  However, there is not a single allegation regarding the unauthorized use of, transfer of, or any other wrongdoing on the part of Appellant as it relates to intangibles.

180.     "To pass muster under [Rule] 9(b), the allegations in the complaint must specify the time, place, speaker and content of the alleged fraud or misrepresentation so that the defendant's intent to defraud is evident in the complaint."[208]

181.     Appellee's complaint contains none of the required elements of a fraud pleading as it relates to intangibles.[209]  The pre-trial order provides no additional specificity as it relates to intangibles.[210]

182.     If Appellee had wanted to introduce evidence at trial about matters outside the pleadings, it would have been required to seek an amendment to confirm its pleadings to the issues actually raised at trial.[211]  Appellee did not do so (nor did it even attempt to do so).[212]

183.     The Bankruptcy Court erred in allowing the admission of evidence on matters that were outside the scope of the pleadings and the pre-trial order.

---

[208] *Ross v. Bolton*, 904 F.2d 819, 823 (2d Cir. 1990); *Torres-Aponte v. JP Morgan Chase Bank, N.A.*, No. 15-20362 (5th Cir. 2016); *Guey Ming Yeh v. Safeco Insurance Company of Indiana*, Case No. 4:18-cv-00026 (U.S. District Court, E.D. Texas, 2018) ("Rule 9(b)'s particularity requirement generally means that the pleader must set forth the 'who, what, when, where, and how' of the fraud alleged."  (Citing *United States ex rel. Williams v. Bell Helicopter Textron, Inc.*, 417 F.3d 450, 453 (5th Cir. 2005)).

[209]  *See Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002) ("A plaintiff pleading fraud must specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.").

[210] *See* 2nd Supp. R. 796-823 (pre-trial order).

[211] *Wallin v. Fuller*, 476 F.2d 1204, 1210 (5th Cir. 1973).

[212] Note that, to the extent Appellee alleges that any issue outside its pleadings was raised in its trial brief, it is undisputed that Appellee's trial brief was filed late and therefore should not be considered.  The Scheduling Order, R. 1383 (¶4) very clearly requires that trial briefs be filed **seven days prior to docket call**.  Docket call in this matter was held on April 8, 2019 (1st Supp. R. 1) (Dkt. 12-1 in this matter).  Appellee's trial brief was filed on May 20, 2019, exactly six weeks after docket call (R. 1554).

<u>**Issue #13:  Whether the Bankruptcy Court erred in considering purported**</u>
<u>**fraudulent actions that occurred subsequent to the Debtor's petition for bankruptcy**</u>

184.    In its Findings and Conclusions, the Bankruptcy Court considered

numerous events that occurred subsequent to the Petition Date of Appellant's bankruptcy

case—July 30, 2017.  It is axiomatic that a consumer bankruptcy only considers debts

that arose prior to the bankruptcy filing.  It is equally self-evident that a

nondischargeability action—which seeks a finding of nondischargeability of a *pre-*

*petition* debt—could only be based on conduct and events that occurred prior to the filing

of the bankruptcy case.

185.    Despite this, the Bankruptcy Court wrongfully considered numerous post-

petition events.

186.    A few examples:  (1) subcontract payment application issued to Cresta

Construction on August 21, 2017 (R. 20 (¶49)); (2) A subcontract payment application

issued to Cresta on August 24, 2017 (*Id.*); (3) The issuance of an invoice by LBCR to

Cresta on September 18, 2017 (*Id.*, at ¶¶51, 53); (4) The issuance by LBCR of a

"Subcontract Change Order" to Cresta on August 8, 2017 (R. 21 (¶51)) (note that the

Bankruptcy Court correctly acknowledges that this Subcontract Change Order was issued

after Appellant's bankruptcy filing, but appears to suggest that LB was somehow

involved, despite the fact that LB had discontinued operations, as a debtor in bankruptcy

is required to do; (5)  The issuance by Trinity Transcon of a check to LBCR on August

22, 2017 (R. 24 (¶65)); (6) The issuance by CTC of a check to LBCR on November 2,

2017 (R. 27 (¶80)); and (7) The issuance by CTC of a check to LBCR on December 8,

2017 (*Id.*, at ¶82).

187.    The Bankruptcy Court erred in considering matters which occurred after

the filing date of Appellant's bankruptcy case.

**Issue #14:  Whether the Bankruptcy Court erred in finding the existence of "actual fraud"**

188.    The earlier discussion of the U.S. Supreme Court's discussion in *Husky* is incorporated by reference.[213]  In *Husky*, Ritz, Husky's owner, drained his company of assets.  Here, Appellee did not establish that Appellant transferred assets of LB.

189.    Instead, Appellee concocted the notion that Appellant was somehow required to conduct business under a certain business entity—notwithstanding the financial condition of LB that could have jeopardized its clients.

190.    Because of the financial condition of LB in early to mid-2017, LB was at risk of having suppliers refuse to allow it the credit necessary to obtain materials.  It was further at risk of the possibility that multiple creditors could levy funds received as a deposit from new customers.

191.    And even if Appellee had established (it did not) that LBCR performed contracts that could have been performed by LB and therefore constitutes some sort of "deemed" transfer, it did not establish a *fraudulent* transfer because LBCR incurred an obligation to perform, thereby negating any fraudulent transfer argument that there was not adequate consideration received.

192.    Once again, there are no facts in the case at bar that are similar to the gratuitous transfers found in *Husky*.

193.    As noted above, in *Lombard*, the New Hampshire Bankruptcy Court determined that the claim in *Husky* was only valid because of the Texas statute allowing for shareholder liability for "actual fraud" of the corporation in certain instances. It further found that the claim in *Lawson*, a First Circuit case also described above, involved

---

[213] *See* ¶¶ 63-75, *supra.*

a situation where the creditor had obtained a judgment for the recovery of a fraudulent transfer prepetition, under a Rhode Island statute.[214]

194.    Just as with *Lombard* and *Lawson*, here, Frost sought to impose liability for a fraudulent transfer scheme on Appellant.  However, it did not establish any right to recovery directly from Appellant under state or federal law.[215]  Therefore, Appellee was required to establish some ground to pierce the corporate veil of LB, but Appellee did not make any such veil-piercing allegations, as was done in *Husky*.

195.    Nor did Appellee plead that a fraud was perpetrated for Appellant's direct personal benefit.  Without the ability to pierce the corporate veil, Appellee cannot pursue its "actual fraud" claim.[216]

196.    *In re Tegeler*, 586 B.R. 598 (Bankr. S.D. Tex., 2018), clarifies the "actual fraud" analysis under § 523(a)(2)(A), explaining that one of two routes must be satisfied. The first is satisfaction of the traditional fraud elements.[217]  Based on the analysis above, Appellee cannot satisfy multiple elements of traditional fraud, including the existence of false representations as well as reliance.  The second, the *Husky* approach, requires piercing of the corporate veil—notwithstanding the existence of a personal guarantee.[218]

197.    Once again, Appellee did not seek to pierce the corporate veil.  Appellee also did not allege in its written pleadings that Appellant acted primarily for his direct

---

[214] Citing The Rhode Island Uniform Fraudulent Transfer Act, R.I. Gen. Laws § 6–16–1 et seq. See *Lawson*, 791 F.3d at 217.

[215] As noted previously, Appellant had personal liability on the debt to Frost, but that liability was on a non-fraud ground, and courts have held that a personal liability is insufficient to obfuscate the need to pierce the corporate veil.  *See In re Tegeler*, 586 B.R. 598, 666, 672-692 (Bankr. S.D. Tex., 2018) (the *Husky* approach to non-dischargeability under § 523(a)(2)(A) for actual fraud requires piercing of the corporate veil – notwithstanding the existence of personal guarantees).

[216] As noted above, even if Appellee had sought to pierce the corporate veil, it could not have done so because such a claim belongs to the estate.  *See* ¶65 and n.80-81, *supra*.

[217] *In re Tegeler*, 586 B.R. 598, 666.  Those elements include:  (1) Debtor made representations; (2) Debtor knew they were false at the time made; (3) Debtor made the representations with intent and purpose to deceive the creditor; (4) The Creditor relied on such representations; and (5) The creditor sustained losses as a result of the representations.

[218] *Id.*, at 672.

personal benefit, as is required.[219]  Appellee therefore cannot hold Appellant liable for actual fraud under a veil-piercing theory.

198.    The Bankruptcy Court erred in finding that Appellant engaged in "actual fraud."

---

[219] *See TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589, 603 (Tex. App. – Houston [14th Dist.] 2017, no pet.).

**Issue #15:  Whether the Bankruptcy Court's finding of a supposedly "fraudulent conveyance scheme" can stand without the existence of an actual "fraudulent conveyance" as defined under Texas or federal law**

199.     In this case, Appellee pled the existence of a "fraudulent transfer scheme." However, Appellee did not establish – nor did it even attempt to establish – the existence of a fraudulent transfer.

200.     Appellee takes the position that it is not required to establish a fraudulent transfer in order to establish a "fraudulent transfer scheme."  However, if it cannot even establish the existence of a fraudulent transfer, then how can it hope to establish the existence of a "fraudulent transfer scheme"?[220]  Is a "fraudulent transfer scheme" something that a Court is expected to just recognize when it sees it?  Or must there be some objective standard and elements that must be proven in order for a plaintiff to establish the existence of a "fraudulent transfer scheme"?  The Appellee's theory appears to be to throw out a lot of facts, assert the existence of transfers, and then establish that it didn't get paid.  It must be a fraudulent transfer scheme!  The caselaw does not support such a haphazard analysis.

201.     It only seems logical that a "fraudulent transfer scheme" would involve fraudulent transfers, and that a Plaintiff would therefore be required to establish such a fraudulent transfer under state law.[221]

202.     The plaintiffs in the cased cited above—namely *Husky* and *Lombard*—both established the existence of fraudulent transfers (under Texas law in *Husky*).

---

[220] *Cf. Tummel v. Milane*, Case No. 19-40148 (5th Cir. December 6, 2019) ("As the Supreme Court of Texas has recently clarified, 'civil conspiracy is a theory of vicarious liability and not an independent tort.'") (citing *Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 140-42 (Tex. 2019)).  Similarly, here, an independent tort (a fraudulent transfer) must be the basis of an alleged "fraudulent transfer scheme."

[221] *See, id.* (analogy to civil conspiracy and the requirement of an independent tort).

Appellee did not.[222]  Appellee neither pled nor proved any fraudulent transfer.

203.    Even if Appellee had pled a fraudulent transfer, it would fail because Texas law is clear that a fraudulent transfer begins with a debtor either transferring an asset or incurring an obligation. A transfer, in turn, requires the debtor to dispose of or part with an asset.  Tex. Bus. & Comm. C. § 24.002(12).

204.    Texas law defines an asset as property of a debtor, but it expressly excludes property to the extent it is encumbered by a valid lien. *Id.*, at § 24.002(2)(a).

205.    Therefore,  a transfer of property that is fully encumbered by valid liens may not as a matter of law constitute a fraudulent transfer under the Texas Uniform Fraudulent Transfer Act.[223]

206.    It is undisputed that Appellee's loans to LB were secured by assets of LB. Therefore, a transfer of such assets cannot be a fraudulent transfer.

207.    The Bankruptcy Court erred by not requiring that any "fraudulent transfer scheme" be accompanied by a fraudulent transfer as that term is defined under Texas law.

---

[222] Note that Appellee acknowledged not having filed a fraudulent transfer claim.  See R. 925-26 (p. 551:25-552:3) (without support, Appellee alleged that "Actual fraud encompasses a fraudulent conveyance scheme even when the scheme does not involve a fraudulent conveyance.  We haven't sued for fraudulent conveyance, but this is part of the scheme.").

[223] *See In re 1701 Commerce Street*, 511 B.R. 812 (Judge Lynn held precisely that – that you can't have a fraudulent transfer of property encumbered by a valid lien.)  Note that the *1701 Commerce Street* also stood for the proposition that even if all other requirements had been satisfied, a transfer will not be deemed a fraudulent transfer if a legitimate purpose has been established.  To the extent that any transfer was established, Appellant established a valid and legitimate purpose for LBCR, and that is that LB did not have the ability to perform.

**Issues #16-19:**  Intentionally omitted as duplicative and/or subsumed in other issues.


**Issue #20:  Whether the Bankruptcy Court erred in disallowing testimony of Appellant regarding his knowledge or intent**

208.    On numerous occasions, the Bankruptcy Court disallowed testimony from Appellant regarding his intent.[224]

209.    Intent is a crucial element of Appellee's causes of action.  Therefore, the Bankruptcy Court erred in disallowing such testimony.

---

[224] *See. e.g.*, R. 805 (p. 432:6-15); *See* Offer of Proof, R. 854-62 (p. 480:14-488:11).

**Issue #21:  Whether the Bankruptcy Court erred in disallowing the testimony of Danny Stokes and Kent Sparks, signers of checks**

210.    The Bankruptcy Court found that Appellant diverted revenue from the Cross Timbers Church project.  In doing so, it ignored evidence making it clear that Cross Timbers intended to do business with LBCR, the new entity.

211.    Appellant asserts that Ron Tivis, the Director of Operations at CTC, established such intent.  However, to the extent testimony from the signers of the checks erroneously written to LB would have more clearly established such intent, it was error to exclude such testimony.

212.    No harm would have befallen Appellee from the Court allowing such testimony, the necessity of which only became clear when Frost made certain arguments in the related State Court Litigation.

213.    Appellee was forced to acknowledge that it had to "show some of its cards" in the State Court Litigation,[225] as if disclosing legal arguments was some sort of game.  It was only when Frost "showed its cards" that Appellant recognized that the testimony of Stokes and Sparks might be necessary.[226]

214.    The Court therefore erred in not allowing the testimony of individuals that would have made the intent of the parties to the contract clearer.

---

[225] 1st Supp. R. 8 (8:7-12).
[226] Appellant asserts that the testimony of Ron Tivis establishes the requisite intent of Cross Timbers as it relates to payments, but he admittedly did not sign the actual checks.

**Issue #22:  Whether the Bankruptcy Court erred in allowing into evidence Wells Fargo bank statements with no business records affidavit**

215.     The Bankruptcy Court questioned Appellant's assertion that bank statements represent hearsay.[227]

216.     Circuit courts around the country have consistently recognized that bank statements are classic hearsay that may nevertheless be admitted into evidence under the business records exception pursuant to Fed. R. Evid. 803(6).[228]  For that exception to apply, the proponent of the evidence must supply an affidavit from the custodian of such records; Appellee provided no such affidavit.

217.     Appellee clearly did not have personal knowledge regarding the bank statements it sought to admit, and the documents were not self-authenticating.

218.     The Bankruptcy Court erred in admitting bank statements without a business records affidavit.

---

[227] R. 571 (p. 199:5-6).

[228] *See, e.g., In U.S. v. Anderson*, 904 F.2d 41 (9th Cir. 1990) ("Although hearsay, the bank's statements were admissible under the business records exception pursuant to Fed. R. Evid. 803(6)."); *In Baker v. Firstcom Music*, 2018 WL 2572725 (C.D. Cal., 2018) ("Although a bank statement is hearsay, it is admissible under the business records exception pursuant to Fed. R. Evid. 803(6). [citing *Anderson*, 904 F.2d 41].

**Issue #23:  Whether the Bankruptcy Court erred in admitting Appellee's Exhibits 21-36 and 51 based on a clearly defective business records affidavit**

219.    Admission of Exhibits 21-36 and 51 was based on a clearly defective business records affidavit.[229]

220.    In the purported "business records affidavit," the Cresta representative attempted to prove up numerous documents as Cresta's business records that could not possibly be Cresta's business records, including:

(1) Appellant's bank statements;[230]

(2) Documents bearing Appellant's Bates label;[231]

(3) An e-mail received by Appellant from his mother;[232]

(4) A bank image of a check.[233]

221.    Additionally, the affiant, DJ McGlothern, admitted on the face of the affidavit that he no longer worked at Cresta.[234]  It's difficult to understand how a former employee can be a "custodian of records," as is represented in the affidavit.

---

[229] The business records affidavit appears as the first page of Exh. EE (2nd Supp. R. 682) and purports to support the admission of Appellee's Exhibits FB21-FB36 and FB51.  *See* R. 558 (186:5-12).

[230] *See* Exh FB-28 (2nd Supp. R. 243-244); *see* discussion at R. 574-75 (202:14-203:12).

[231] *See* Exhs. FB-29 – FB-34,  (2nd Supp. R. 245-263)); *see* discussion at R. 578-580) (206:13-208:14).  The Court admitted this exhibit despite the fact that the business records affidavit states that the records attached are the original or exact duplicates – which is not possible where a document had Appellant's Bates label.

[232] *See* Exhs. FB-31 – FB-33 (2nd Supp. R. 256-261); *see* discussion at R. 585-86) (213:20-214:16).  Note that, in this case, the Bankruptcy Court even acknowledged that the e-mail should not have been a part of the Cresta business records, and stated she was "going to rip this out because it makes no sense," but then proceeded to admit the exhibit.

[233] *See* Exhs. FB-34 and FB-35 (2nd Supp. R. 263, 267-68); *see* discussion at R. 593-96) (221:4-224:13).

[234] *See* Exh. EE, 2nd Supp. R. 682.

**Issue #24:**  Intentionally omitted as duplicative and/or subsumed in other issues.

**Issue #25:  Whether the Bankruptcy Court inappropriately comments on the alleged credibility of witnesses as a pretext for supporting its ultimate conclusions – despite no statement of any basis for its comments**

222.    On multiple occasions in its findings and conclusions, the bankruptcy court expresses as an apparent "finding" that the testimony of Appellee's representative is "credible".

223.    Examples abound:  (1) R. 50, ¶12 ("Mr. Fleming credibly testified that he requested the meeting to discuss the Borrowing Entity's business, customers, work . . ."); (2) R. 50, ¶13 ("Mr. Fleming also credibly testified that he reviewed the Borrowing Entity's underlying documents . . .");  (3) R. 50, ¶14 ("Mr. Fleming further credibly testified that, at the time of the meeting, he looked at the revenue and income of the Borrowing Entity.");  (4)  R. 50, ¶15 ("Mr. Fleming credibly testified that he determined that the Borrowing Entity was insolvent at the time of the February 10, 2017 meeting."); (5) R. 51, ¶17 ("Mr. Fleming credibly testified that he asked how the project was going, about the relationship Mr. Lawrence had with the general contractor, and how frequently payments were being made."); (6)  R. 51, ¶20 ("Mr. Fleming credibly testified that the Debtor represented that he was actively bidding other jobs.").

224.    Ironically, the statements that the Court finds so credible relate to either meaningless statements (*e.g.,* in (1) above, why would the bank's witness lie about requesting a meeting? In (2) and (3) above, is it at all surprising that a bank representative would review underlying documents or that he looked at the revenue and income?) or statements that actually confirm the veracity of the Appellant (*e.g.,* in (4) above, Mr. Fleming's testimony regarding the Appellant being insolvent not only confirms the financial problems that Appellant and his company were having (and that Appellant had

accurately described) but also confirms that Appellee was fully aware of such problems and precarious financial position).

225.    At the same time, the Court makes assertions that Appellant's testimony was somehow lacking in such credibility – despite no basis for its assertions.

226.    For example, the court makes the following finding in ¶32 of its Findings of Fact:

> Also, in April of 2017 – it is unclear what date and, specifically, whether it was before or after the New Entity was formed – Mr. Lawrence met with a bankruptcy attorney and decided that he and the Borrowing Entity would file for bankruptcy. The Debtor testified that he did not file bankruptcy immediately, but, rather, waited to file for approximately three months because he did not have the funds to file. 36 The court did not find this testimony credible. In fact, Mr. Lawrence had a somewhat selective memory throughout Trial. He frequently "did not know" or "did not recall" whenever asked pertinent questions.

227.    The Bankruptcy Court ignores the fact that Appellant's testimony makes perfect sense.  Two months after Appellant's meeting with Appellee, his financial condition had not improved (and had, in fact worsened after losing $500,000.00 in business), and he consults with a bankruptcy attorney and ultimately decides to file for bankruptcy.  However, because of his financial condition, he has insufficient funds to pay a bankruptcy attorney.  Therefore, he waits until he does – which occurs three months later.

228.    The Bankruptcy Court's comment regarding Mr. Lawrence's alleged "selective memory" is what is truly lacking in credibility.[235]  Mr. Lawrence testified

---

[235] The Bankruptcy Court goes on to assert, as an apparent basis for its finding Appellant to be lacking in credibility, that Appellant "frequently 'did not know' or 'did not recall' whenever asked pertinent questions."  The Court did not cite to specific instances of such testimony, but a text search of the Record for the words "I don't know" reveals nearly as many iterations of the Court and counsel for Appellee uttering "I don't know" as there are for Mr. Lawrence, and many of Mr. Lawrence's such iterations relate to an expressed lack of understanding of the question asked rather than as a substantive response.  Similarly, a text search of the Record for the words "do not recall" reveal three instances of the words by Mr. Lawrence – two of which were responses to questions from counsel for Appellee in which the substance of the response was indicating that he did not agree with the conduct alleged by the question, and he was responding that he did not recall engaging in such conduct.  Therefore, the substance of the response was actually a "no" rather than an indication that he did not remember something.

truthfully and credibly throughout, and the Bankruptcy Court did not point to a single

instance in which Mr. Lawrence was not 100% truthful.  In fact, even the Court

acknowledged – almost begrudgingly – that all of the documents that Mr. Lawrence

provided to Appellee at the February 10, 2017 meeting were accurate.[236]

229.    The Bankruptcy Court goes on to analyze the supposedly "startling"

timeline, but in the process confirms the story that Appellant told, *i.e.*, that two months

**<u>after</u>** the February 10, 2017 meeting, that Appellant decided to file for bankruptcy.  It's

not really clear what the Court finds as startling.

230.    Subsequently, in its Conclusions of Law, the Bankruptcy Court concludes

that:

> Mr. Lawrence made false representations to Frost Bank regarding the
> Borrowing Entity's, Lawrence Built's, intent to honor its payment
> obligations and Mr. Lawrence's commitment to the success of Lawrence
> Built-when, in fact, Mr. Lawrence intended to form the New Entity and
> file bankruptcy for himself and the Borrowing Entity.

There is not a scintilla of evidence to suggest that Appellant knew and intended to form a

new entity and file bankruptcy at the time of the February 10 meeting.  To the contrary,

the uncontroverted evidence in the Record is that Mr. Lawrence first considered and

ultimately determined to file for bankruptcy in mid-April, 2017—two months after

meeting with Appellee.

231.    In conclusion, the Bankruptcy Court went to great lengths to find the

existence of oral misrepresentations—statements that, at best, amount to Appellant's

hopes that his business could rebound from the clearly devastating loss of income that

had occurred.  Despite conveying a clear and accurate picture of his company's financial

---

[236] *See* R. 73 (¶18) ("Moreover, the Debtor did provide two written statements regarding accounts receivable **<u>and these appeared to be true</u>**, in that they showed accounts receivable in the pipeline that the Debtor anticipated would be collected.") (emphasis added).

position; and despite Appellee's clear understanding of his company's financial position; and despite the admitted 100% truthfulness of the documents presented by Appellant to Appellee that showed accurate accounts receivable and accurate projections of future income—the Bankruptcy Court anchors its decision on alleged representations that Appellant intended to honor his obligation and was committed to the business; that he hoped to be successful; and that he even hoped to be able to pay the note off sooner than required.

232.    The Bankruptcy Court's finding of the existence of misrepresentations is simply not plausible, and the District Court should thereby overturn any ruling that was based on the Bankruptcy Court's findings of a misrepresentation on the part of Appellant.

**Issue #26:  Whether the Bankruptcy Court erred by and prejudiced Appellant by limiting the amount of time allowed for Appellant to present its case in chief (which was substantially less time than was allowed for Appellee to present its case in chief)**

233.    This issue, standing alone, is not cause for a reversal of the Bankruptcy Court's ruling.  However, this issue should not be viewed in a vacuum.  When combined with other issues raised herein, the fundamental fairness of the trial court is called into question.

234.    Appellee took almost exactly eight hours to put on its case-in-chief— seven hours on May 21, 2019, and one hour on May 22, 2019.  Appellant took 4.5 hours to put on his case-in-chief on May 22, 2019, and at the end of the day was given only an additional 30 minutes to complete his case-in-chief .

235.    The Bankruptcy Court had made up its mind how it was going to ultimately rule in this case before the trial ever began.  It is demonstrated in numerous ways:

> (1) Pre-trial rulings denying Appellant the right to assertion of all affirmative defenses; dismissal of Appellant's cause of action related to discharge injunction;

> (2) Evidentiary rulings:  (a) Allowing use of a business records affidavit that was clearly not made with personal knowledge; (b) Denial of testimony related to the intent of Appellant – which is clearly an element of causes of action alleged; (c) Denial of the clear hearsay nature of bank statements;

> (3) Repeatedly cutting off Appellant's counsel during his closing argument, while not doing the same for Appellee;

> (4) Imposing arbitrary and unfair time restrictions on Appellant's ability to present his case; and

> (5) Unwarranted and unsupportable comments on the credibility of witnesses.

To be clear, there are plenty and sufficient errors outlined above to warrant a reversal and

rendering for Appellant.

## CONCLUSION

236.    The District Court should reverse the ruling of the Bankruptcy Court.  The Bankruptcy Court's ruling is not supported by the overwhelming weight of the evidence and is inconsistent with the purpose of the Bankruptcy Code, specifically including a fresh start.

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g) and Fed. R. Bankr. P. 8015(a)(7)(C), I hereby certify that this Brief complies with the word limitations of Fed. R. App. P. 32(a)(7)(B)(i) and Fed. R. Bankr. P. 8015(a)(7)(B)(i) in that, according to undersigned counsel's word processing system, this Brief contains 12,448 words.


**/s/ Gregory W. Mitchell**
Gregory W. Mitchell
Counsel for Appellant